**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | | |
|---|---|---|
| **HAMPTON UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. _____** |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **ACCREDITATION COUNCIL FOR** | ) | |
| **PHARMACY EDUCATION,** | ) | **INJUNCTIVE RELIEF SOUGHT** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Hampton University ("Hampton") states the following in support of this action:

## INTRODUCTION

The Hampton University School of Pharmacy ("HUSOP") produces more African-American pharmacists in Virginia than any other pharmacy program, and is amongst the top three producers of African-American pharmacists from any pharmacy program across the United States. Over 96% of HUSOP's graduates reported that they go on to work in medically underserved communities as compared to the national average of 9.6% of pharmacy school graduates across the country. And yet, during the greatest public health crisis this country has faced in a century— one which is likely to go on for years and which is disproportionately affecting African-American and other families of color in this country—and during the nation's simultaneous reckoning with a legacy of structural racism and the myriad obstacles to obtaining health and wealth for people of color, the Accreditation Council for Pharmacy Education ("ACPE") has  rendered a decision that will strip HUSOP of its accreditation, ruin its reputation, and almost certainly destroy it by using what can only be described as a bizarrely contradictory and Kafkaesque bureaucratic process rife with bias and revenge.

As such, Hampton's hand has been forced by ACPE. It cannot let ACPE's unreasonable and discriminatory practices stand and, as a last resort, Hampton is filing this lawsuit and asking the Court to require ACPE to do what it should already be willing to do without judicial intervention: be fair.

Despite the repeated requests and numerous, considerable efforts that Hampton has put forth to resolve this matter, ACPE has flatly refused to abide by its own accreditation policies and procedures and has continued to move the goal post in order to penalize Hampton.

Hampton asks that this Court reverse ACPE's biased, discriminatory, arbitrary and capricious decision to withdraw HUSOP's accreditation, and require ACPE to afford HUSOP its constitutional, common law, and statutorily protected due process rights by administering its policies and procedures as they are written; by providing adequate notice to HUSOP about the alleged deficiencies ACPE has identified in the school's program before ACPE decides to withdraw HUSOP's accreditation; and by assessing HUSOP's program without bias. If ACPE's arbitrary action is not reversed, then the accrediting agency will have unilaterally terminated an extremely important community-oriented pharmacy program at one of the nation's premier Historically Black Colleges and Universities during a pandemic that has disproportionately impacted those communities which HUSOP serves.

HUSOP understands that it must accept ACPE's accreditation decisions when they are reasonable, fair, and unbiased. However, neither ACPE's policies nor due process require HUSOP to *accept* an unsubstantiated withdrawal decision that does not comport with ACPE's own rules or fundamental tenets of due process and fair play. The Fourth Circuit has been clear: "[An accreditation agency's] duty, put simply, is to play it straight." *Prof'l Massage Training Ctr. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 170 (4th Cir. 2015); *Mt. State Univ., Inc.*

*v. Higher Learning Comm'n*, Civil Action No. 5:14-16682, 2017 U.S. Dist. LEXIS 34376, at *5 (S.D. W. Va. Mar. 2017). HUSOP was not afforded fairness, and an even playing field is all it is requesting.

## THE PARTIES

1.      Hampton is a 501(c)(3) non-profit Historically Black Colleges and Universities member ("HBCU") with its principal place of business in Hampton, Virginia.

2.      ACPE is an organization incorporated in Illinois. ACPE is a national accrediting agency for pharmacy programs. It has a Board of Directors ("the Board") that renders decisions on member-pharmacy schools' accreditation status. In the United States and most certainly in Virginia, a student cannot practice pharmacy unless he or she graduates from an ACPE-accredited pharmacy school. *See* VA. CODE § 54.1-3312. Because the Department of Education ("DoE") recognizes ACPE as an accreditation agency, a pharmacy school that is accredited by ACPE may be eligible to participate in federal funding programs.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332(a)(1), as this dispute is between citizens of different states, the amount in controversy exceeds $75,000 (exclusive of interest and costs), and there is complete diversity between the parties. There is original jurisdiction pursuant to 28 U.S.C. § 1331 because Hampton asserts a claim under 42 U.S.C. § 1981. This Court also has subject matter jurisdiction pursuant to 30 U.S.C. § 1099(b)(f), which provides for exclusive federal jurisdiction over disputes involving an accrediting agency like ACPE.

4.      This Court has personal jurisdiction over ACPE because ACPE purposely availed itself of the privileges and benefits of providing professional accreditation services to HUSOP in

Virginia, and ACPE's conduct at issue in this litigation caused consequences that are being felt by HUSOP in Virginia.

5.      This Court is the proper venue pursuant to 28 U.S.C. § 1391 because the acts giving rise to this Complaint occurred in this District, and there is no other venue that is more appropriate or convenient.

## FACTS

### General Background

6.      HUSOP is the only HBCU source of African-American pharmacists in the Commonwealth of Virginia, and it is the second-largest producer of African-American pharmacists in the United States.

7.      During the 2018-19 academic year, HUSOP had the highest percentage of Black pharmacy graduates in relation to total enrollment of any other program in the country.

8.      Hampton is regarded as one of this country's strongest research institutions, having secured millions of dollars in research grants to study health concerns in vulnerable populations.

9.      HUSOP is a significant driver of undergraduate admissions at Hampton for students who want to attend HUSOP after completing their undergraduate studies.

10.     HUSOP has had, and continues to have, a direct and positive impact with primary care services on local communities that are substantially underserved. All of HUSOP's students receive training at free health clinics in Hampton Roads, an area with an African-American population that is 2.5 times the national average. Further, in a recent survey, over 96% of HUSOP's graduates reported going on to work in medically underserved communities around the country, which is ten times the national average of other pharmacy school graduates.

11.     HUSOP's commitment to serving on the front lines in these communities is particularly critical in light of the current COVID-19 crisis, as data confirms that the virus has significantly, negatively, and disproportionately impacted minorities in medically underserved communities.

12.     Per the Higher Education Act ("HEA"), HUSOP is required to be a member of a recognized accrediting agency in order to be eligible to receive federal funding, including student financial aid. *See* 34 CFR § 600. As such,  HUSOP is a member of ACPE.

13.     HUSOP is the only pharmacy program in the country to receive funding from the Health Resources & Services Administration from 2016-2020 to provide scholarship assistance to underprivileged and disadvantaged students who would otherwise be financially excluded from similar opportunities.

14.     HUSOP's student population directly benefits from these scholarships and other sources of financial aid, as many have been disproportionately impacted by non-academic and/or socioeconomic challenges. Many of the program's students are first-generation graduate students.

15.     The DoE works alongside accreditation agencies like ACPE to ensure that institutions like HUSOP are preserved. The DoE's commitment to this mission is reinforced by a recent revision made to its rules, effectively requiring accrediting agencies to afford institutions at least four years to remedy compliance issues before an accrediting agency takes action. *See* 34 C.F.R 602.20. These rules complement other regulations that exist expressly to "strengthen" HBCUs. *See*, *generally*, 34 C.F.R. Part 608.

16.     ACPE uses twenty-five standards, known as "Standards 2016," to evaluate pharmacy programs for accreditation, which are distinct from its policies and procedures.

**HUSOP's Accreditation is Renewed for Eight Years**

17.     In 2014, ACPE conducted a comprehensive review of HUSOP's program.

18.     Prior to that comprehensive review, HUSOP spent several years strengthening its curriculum in order to improve its graduates' scores on the licensure examination (commonly known as "NAPLEX") administered by the National Association of Boards of Pharmacy. All students must pass the NAPLEX in order to be licensed and to work in the field.

19.     HUSOP also expanded opportunities for experiential learning, created more rigorous student assessments, and focused on exam preparation. HUSOP detailed these efforts in a self-study report and over 1,000 pages of supporting information.

20.     These efforts culminated in ACPE's Board voting to renew HUSOP's accreditation for eight years, which is the maximum continuous period of accreditation that ACPE confers on any pharmacy program.

**ACPE Cites HUSOP as Non-Compliant on Standard 17: Progression**

21.     Approximately a year later, in 2016, ACPE cited HUSOP as being non-compliant with **Standard 17: Progression** ("Standard 17"). Standard 17 reads:

**Standard 17: Progression**

The college or school develops, implements, and assesses its policies and procedures related to student progression through the PharmD program.

**Key elements**:

**17.1. Progression policies** – The college or school creates, makes available to students and prospective students, and abides by criteria, policies, and procedures related to:
- Academic progression
- Remediation
- Missed course work or credit
- Academic probation
- Academic dismissal
- Dismissal for reasons of misconduct

- Readmission
- Leaves of absence
- Rights to due process
- Appeal mechanisms (including grade appeals)

**17.2. Early intervention** – The college or school's system of monitoring student performance provides for early detection of academic and behavioral issues. The college or school develops and implements appropriate interventions that have the potential for successful resolution of the identified issues.

22.     According to ACPE's policies and procedures, a determination of "Non-Compliant" means that the program is not compliant with any of Standard 17's elements; "Partially Compliant" means that "the program is compliant with some elements of the standard but has deficiencies that bring an element(s) of the standard into non-compliance; [and] the college or school has a viable plan that has not been implemented but which should bring all elements of the standard into compliance within an acceptable timeframe."  Therefore, in the course of just one year, ACPE's Board, by its own defined terms, ruled that HUSOP, which had the full array of policies required by Standard 17 a year earlier according to ACPE's own measure, had no such policies whatsoever.

23.     Shortly after being cited for non-compliance, HUSOP was put on probation by ACPE's Board as a result of its cited non-compliance.

24.     In the July 2017 Action and Recommendations Report ("July 2017 A&R Report") subsequently issued to HUSOP, ACPE's Board did not identify any standards or benchmarks that HUSOP failed to meet. Furthermore, the Board failed even to mention why it thought HUSOP's program, which was found to be compliant for Standard 17 just two years prior, had become so abysmal that it needed to drop from "Compliance" past "Partially Compliant" all the way down to "Non-Compliant."

25.     After receiving the July 2017 A&R Report, HUSOP's Dean, Dr. Anand Iyer, reached out to ACPE's Assistant Executive Director, Dr. J. Gregory Boyer, to discuss ACPE's concerns and the steps HUSOP needed to take in order to make sure that there were no future accreditation issues. The two met for roughly an hour and a half during the American Association of Colleges of Pharmacy's annual meeting along with another ACPE colleague, Dr. Peter Vlasses, and two HUSOP administrators, Dr. Vera Campbell and Dr. Ebony Andrews.

26.     During this meeting, Dr. Boyer clearly stated that ACPE had no interest in withdrawing ACPE's accreditation. Per his instructions, the next plan that HUSOP was required to submit to ACPE did not have to show "immediate results"; it just needed to show "immediate improvements."

27.     When Dr. Iyer asked Drs. Boyer and Vlasses about HUSOP's being placed on probation so soon after receiving full accreditation, Dr. Vlasses stated that ACPE gave HUSOP "the rope" by granting the school an eight-year accreditation term, and he proceeded to remind Dr. Iyer about ACPE and Hampton's history dating back to a 2009 lawsuit Hampton filed against ACPE for a different accreditation decision.

### ACPE's October 2017 Consultative Visit

28.     Shortly after the meeting, Dr. Iyer asked Dr. Boyer to provide his consultative services in advance of ACPE's scheduled formal review of HUSOP. Hampton agreed to pay a fee of $3,800.00 in exchange for Dr. Boyer conducting a consultation, including reviewing the report that HUSOP intended to submit in response to the ACPE Board's July 2017 A&R Report.

29.     As agreed upon, Dr. Iyer sent a draft of HUSOP's response report to Dr. Boyer for his review. The report included the steps to be taken by HUSOP to achieve the "immediate improvements" mentioned by Dr. Boyer, including revamping its curriculum, providing

supportive measures to identified at-risk students, making its admission policies and practices more selective, and improving testing outcomes.

30.     Dr. Boyer and Dr. Mary Kiersma, ACPE's Associate Director for Professional Degree Program Accreditation, came to HUSOP in September 2017 to perform the voluntary, non-binding consultation visit in advance of the formal, binding site visit that ACPE's Evaluation Team would conduct the following month.

31.     During the visit, Drs. Boyer and Kiersma made several comments indicating that they were very pleased with HUSOP. Both commented that they liked the response plan HUSOP submitted prior to the consultation visit; that the School was appropriately addressing progression issues by being more selective in its admission policies and practices; that the School was properly prioritizing at-risk students to help them progress; and that the School was properly limiting remediation opportunities.

32.     Drs. Boyer and Kiersma recommended that HUSOP accelerate its curriculum changes, and they emphasized that HUSOP would get into compliance by increasing its students' scores on the NAPLEX licensing exam that graduating pharmacy students are required to pass before being permitted to practice pharmacy.[1] At the end of the consultation, Dr. Boyer stated that ACPE had no intention of shutting down HUSOP and that the agency's goal was to see the exact improvements that HUSOP was currently demonstrating.

33.     Following the consultation visit, HUSOP heeded Drs. Boyer and Kiersma's recommendations and made several programmatic enhancements, including those listed in the

---

[1] In a later, separate conversation between Drs. Boyer and Iyer, Dr. Boyer reemphasized the importance of increasing HUSOP's students' NAPLEX scores—this time even going as far as stating that raising students' NAPLEX scores was the sure way to "get out of the dog house with ACPE."

October 2017 Pre-Site Visit Report it was required to submit to ACPE in advance of ACPE's formal site visit. HUSOP also included information about its progression initiatives and supporting data.

### ACPE's November 2017 Site Visit

34.     From November 8-10, 2017, ACPE's Evaluation Team, which consisted of four[2] specifically trained professionals, came to HUSOP in order to conduct the formal three-day Focused On-Site Evaluation (the "November 2017 Evaluation").

35.     During the visit, the Evaluation Team met with faculty, students, School leadership, and University administrators. By the conclusion of the visit, the Evaluation Team was very complimentary of HUSOP's efforts; the team even went as far as stating that HUSOP had made its students' NAPLEX scores a priority, and that the new initiatives HUSOP discussed during the site visit and listed in its response plan would be sufficient to bring HUSOP into compliance with Standard 17. The team was particularly complimentary of HUSOP's unique competency exam that measures student performance and serves as a necessary component for progression.

36.     During the site visit, Dr. Moné, one of the Evaluation Team members and an ACPE Board member, asked Dr. Iyer what he thought a successful NAPLEX passage rate looked like for HUSOP. When Dr. Iyer responded with a 75% passage rate or higher, Dr. Moné said that this goal was too optimistic given that HUSOP's initiatives were recently implemented.

37.     Three days after the site visit, the Evaluation Team prepared its "January 2018 Evaluation Team Report." The Team noted that HUSOP had "given careful attention to the items

---

[2] Dr Indra Reddy, the Dean of Texas A&M's College of Pharmacy; Dr. Michael Moné, board member of ACPE and VP Associate General Counsel to Cardinal Health; Jeffrey Wadelin, ACPE's Associate Executive Director; and Miriam Mobley Smith, a practitioner and former Dean of Chicago State University's College of Pharmacy.

identified" previously by ACPE. Also, consistent with the comments made by the Evaluation Team during the visit, the "Standard 17" section of the January 2018 Evaluation Team Report graded HUSOP as Satisfactory, or "S", in all of Standard 17's sub-elements, which are divided into two categories: "Progression Policies" and "Early Intervention." An "S" is the highest score that an institution can achieve in these sub-elements.

38.     However, even though HUSOP achieved the highest score possible in every one of Standard 17's sub-elements and received positive feedback regarding the sub-elements, the January 2018 Evaluation Team Report marked HUSOP as being only "Partially Compliant" with Standard 17.

39.     Per ACPE's policies and procedures (*see* Policy 11.4), an Evaluation Team Report is required to include "comment[] on the [pharmacy] program's areas of strength and areas needing improvement," and "mention[] specific areas, if any, where the program is partially or non-compliant with the standards." However, the Evaluation Team did not provide a reason for finding HUSOP only partially compliant with Standard 17; the Team offered no explanation as to why or how it found HUSOP to be partially compliant with Standard 17 while simultaneously finding HUSOP fully compliant with all of Standard 17's sub-elements, nor did the Team address any compliance concerns identified by the Evaluation Team during its site visit.

40.     On the contrary, ACPE's Evaluation Team provided three positive comments about HUSOP's progress and efforts. According to the Team:

> [HUSOP] instituted a number of changes designed to improve student progression. More early indicators of student academic difficulty in courses have been established which facilitate early intervention and remediation. More emphasis has been placed upon NAPLEX success in addition to graduation as desired programmatic endpoints. Benchmarks for student success vis-à-vis indicators of NAPLEX have also been established. Ultimately, the School has a stronger array of more firm requirements for both graduation and NAPLEX eligibility.

More attention has also been focused on addressing non-academic reasons for progression difficulties, which include financial, health, and other personal challenges. The School has developed additional support systems to address these needs.

While the evaluation team notes the improvements realized in progression and graduation rates, it is also noted that some of the changes made are very recent and will thus take some time to demonstrate results.

41.     In December 2017, after the team's site visit, HUSOP submitted a follow-up report that included, among other things, descriptions of "Action Items" that directly addressed Standard 17 and descriptions of other recent positive outcomes from various initiatives designed to support and improve student success.

### ACPE's 2018 Action and Recommendations Reports

42.     ACPE's Board subsequently convened in January 2018. Following that meeting, the Board provided its 2018 Action and Recommendations Report ("January 2018 A&R Report"), which stated that HUSOP would remain on probation because the Board found HUSOP "Partially Complaint" with Standard 17. Despite ACPE's Policy 9.3.1, which requires the Board to state its reasoning for putting a school on probation, and Policy 11.5.1, which requires the Board's Action and Recommendations Report to include an outline of requirements for the school to bring a non-compliant standard into compliance, "Partially Compliant" was the *only* reasoning provided, and ACPE also requested "a brief description of current progression and most recent graduation rates."

43.     Nevertheless, HUSOP continued to make programmatic changes and revisions designed to enhance its program, including strengthening its progression policies and accelerating its new curricular changes so they would begin a year early, as well as providing more information about such structural changes in its follow-up report to ACPE's Board.

44.     In June 2018, the Board issued its next Action and Recommendations Report to HUSOP ("June 2018 A&R Report"), in which it again found HUSOP "Partially Compliant" with

Standard 17. ACPE did not state why HUSOP was still only partially compliant with the standard; it noted only that ACPE intended to use HUSOP's first-attempt NAPLEX passage rates for the graduating class of spring 2018 in order to determine whether HUSOP's recently implemented intervention policies were successfully.

45.    In July 2018, ACPE sent HUSOP a Monitoring Letter ("2018 Monitoring Letter") that did not mention or reference Standard 17.

46.    Two months later, in October of 2018, HUSOP submitted a follow-up report to ACPE, which included information about HUSOP's various initiatives and its progress to date. Given that ACPE clearly stated in its June 2018 A&R Report that HUSOP's first-attempt passage rates for the class of 2018 would be the deciding factor for HUSOP's moving from "Partially Compliant" to "Compliant," HUSOP also submitted information indicating that there was a first-time pass rate of 79% for the graduating class of 2018, which was a 19% increase from the year before and one of the highest rates the school had seen in years.

47.    The first-time pass rate exceeded the expectations of ACPE representatives. *See infra*, ¶ 35.

**ACPE's 2019 Actions and Recommendations Report**

48.    In response, in January 2019, the Board issued another Action and Recommendations Report  ("January 2019 A&R Report"). Despite stating in its last report that the NAPLEX scores were the main reason for the partial compliance finding, the Board did not mention HUSOP's significantly increased NAPLEX scores. Instead, the Board summarily found HUSOP to be "Partially Compliant" with Standard 17 and stated that HUSOP's probation would continue; it  provided no statement of reasons for its probation determination, again in violation of

Policy 9.3.1, and the Board failed to include an outline of requirements for HUSOP to get into compliance with Standard 17, again in violation of Policy 11.5.1.

49.     The only comment included in the January 2019 A&R Report that related to Standard 17 was:

> The ACPE Board continues to find the program to be partially compliant with standard No. 17 Progression. ACPE fully expects that the School will bring this standard into compliance. This standard has remained out of compliance well beyond the customary period allowed for a program to address issues of partial or non-compliance. ACPE has taken this action to continue the program's accreditation status in recognition of the School's many efforts to address ACPE's concerns. Most notably is [sic] the School's actions to address ACPE's concerns with Standard 10: Curriculum Design, Delivery and Oversight, found to be partially compliant in June 2016 but now found to be compliant with monitoring. ACPE shares the School's optimism that changes in admission criteria and in the curriculum will, within time, have a positive impact on Standard 17: Progression, and thus gives the School extra time to demonstrate the anticipated positive outcomes that would bring Standard 17: Progression into compliance.

50.     As required, in October of 2019, HUSOP submitted a follow-up report to the Board that laid out the school's continued initiatives and successful outcomes. By the time HUSOP sent the report, the program had implemented twenty-eight programmatic changes.

51.     Among other data shared with ACPE, HUSOP stated that it successfully implemented the new curriculum for the class of 2019 in accordance with its accelerated timeline; that on-time graduation rates increased to 80.9%; and that the overall 2018 NAPLEX pass rate was 72.73%, an increase of 13% from the previous year.

### HUSOP's Accreditation is Withdrawn

52.     HUSOP did not hear from the ACPE Board again until January 2020, when the Board issued another Action and Recommendations Report ("January 2020 A&R Report"), this time rendering the ultimate decision: withdrawal. This is the entire explanation ACPE provided:

## II. <u>Accreditation Action</u>

Following discussion of the program, it was the decision of the Board that the accreditation of the Doctor of Pharmacy program at Hampton University School of Pharmacy be **withdrawn** for issues of compliance with the following standard:

**Standard No. 17: Progression**

. . . The Board expresses its continued dismay at the lack of urgency conveyed in the School's responses to the Board's continuing concerns about student progression. The Board also expresses grave concern that the changes made by the program have not resulted in significant outcomes to improve progression and attrition percentages. Standard No. 17 was first found to be non-compliant in June 2016 (under Standard No. 19 respectively in Standards 2007).

53. In line with the Board's other reports, the January 2020 A&R Report failed to include discussion of <u>any</u> relevant facts considered by the Board when making its determination; it failed to include discussion of <u>any</u> "policies and procedures related to student progression through the PharmD program," which is the entire focus of Standard 17 and its reason for existing; it did not include a finding on HUSOP's status as "Partially Compliant" or "Non-Compliant" with Standard 17; and it failed to give a written (or any) "<u>statement of the reasons</u> for the adverse accreditation action" as required by ACPE Policy 13.4.

54. Pursuant to ACPE's Policies and Procedures, HUSOP appealed the Board's decision to withdraw its accreditation to the ACPE Appellate Commission.

**April 2020 Hearing before ACPE's Appellate Commission**

55. Prior to the hearing, ACPE and HUSOP submitted briefs to the Appellate Commission.

56. ACPE's submission (1) failed to discuss <u>any</u> "policies and procedures related to student progression through the PharmD program" (the essence of Standard 17) despite claiming that Standard 17 was the entire reason for HUSOP losing its accreditation, and (2) revealed for the

**first time** that ACPE's decision to withdraw HUSOP's accreditation was based on only attrition and on-time graduation rates.

57.     Similar to all of the other incomplete reports ACPE has submitted to HUSOP, ACPE's submission to the Appellate Commission repeatedly references HUSOP's alleged "failure to bring Standard No. 17 into compliance" but never discusses what coming into compliance would have entailed.

58.     ACPE's submission is also full of circular language such as "the Board remained unconvinced that HUSOP was approaching these issues as aggressively as warranted and maintained Standards No. 10 and 17 as noncompliant." The Board reiterated the requirement that any Standard found to be partially or non-compliant be brought into compliance and "[a]t its next meeting dated January 17-20, 2018 . . . the Board acted to continue probation, due to failure to bring Standards No. 10 and Standard No. 17 into compliance. At this time, the ACPE Board extended the two-year window for cause for bringing these standards into compliance until January 30, 2019. . . . This action was taken to provide additional opportunity for HUSOP to demonstrate compliance with Standards No. 10 and 17."

59.     Contrary to all of the information and feedback provided by the Board to HUSOP, a close reading of ACPE's submission appears to show that the Board was actually relying purely on a handful of data points relating to attrition/on-time graduation data.

60.     The key surprises in ACPE's submission were that ACPE: (1) had done nothing to actually evaluate HUSOP's policies and procedures, instead mechanically focusing on a handful of data points; (2) ignored the unrebutted evidence that HUSOP was, indeed, in compliance with the benchmarks upon which it was relying; and (3) was apparently relying primarily on projections for the next two years (2020, 2021) despite the fact that the 2020 and 2021 projections are based

on un-vetted and incomplete data for which HUSOP had not been afforded an opportunity to discuss.

61. In fact, the only reason ACPE had the 2020/2021 projections was because HUSOP provided them orally during its presentation at the January 2020 Board Meeting in response to a single Board member's question. ACPE had never before asked HUSOP to provide data about future cohorts. ACPE promptly proceeded to another topic and did not ask for any context about the future cohort data. To HUSOP's knowledge, ACPE has never once relied on, used, or even considered un-vetted data about a program's future cohorts in order to substantiate (let alone serve as sole support for) an accreditation withdrawal decision.

62. ACPE trains its site evaluators to review only historical data for purposes of compliance with ACPE Standards and continued accreditation during on-site visits.

63. During the hearing on HUSOP's appeal—and in response to HUSOP's argument that ACPE's Board had never given HUSOP a written (or any) "statement of reasons" for the withdrawal of its accreditation pursuant to ACPE Policy 13.4—ACPE responded, not by claiming that its decision contained a statement of reasons as required by Policy 13.4, but that it had already provided HUSOP reasons because ACPE staff allegedly had extensive conversations with HUSOP.

64. Even if this explanation satisfies the requirements of ACPE Policy 13.4, which it does not, ACPE's staff provided only positive and encouraging feedback to HUSOP, recognized the immediate improvements made by HUSOP, and never once indicated that it was likely that its accreditation would be withdrawn specifically for progression benchmarks, including those based on future 2020 and 2021 cohorts.

65.     At the hearing, ACPE stated that the "primary" reason HUSOP's accreditation was withdrawn was because of the projected attrition, dismissal, withdrawal, and delayed graduation percentages for HUSOP's future 2020 and 2021 cohorts per four thresholds listed in a policy that ACPE has <u>never</u> mentioned to HUSOP.

66.     After the hearing, ACPE continued not to provide any statement of reasons, instead doubling down on its "you know what you did" approach and stating, "The totality of the communications between HUSOP and ACPE, including the A&Rs and testimony offered at the hearing by ACPE representatives, make it abundantly clear that ACPE had provided 'reasons' as required by Policies 9.3.1 and 13.4."

67.     ACPE also confirmed that its sole measure of compliance with Standard 17 (which does not mention attrition data or on-time graduation data, but rather "policies and procedures" related to student progression) was five data points: "HUSOP's Update Report goes on to note the program's updated numbers regarding on-time graduation, academic dismissal, withdrawals, delayed graduation and total attrition – all contained in the section addressing Standard 17 (p. 11). This is a perfect example of HUSOP's acknowledgment that it had failed to comply with Standard 17, <u>as measured by the identical five sets of outcomes data contained in ACPE Policy 11.6.3</u>." Significantly, Standard 17 contains no reference to ACPE Policy 11.6.3 nor does it mention "sets of outcome data" contained within it.

68.     On June 11, 2020, the ACPE Appellate Commission issued an Appellate Commission Report that included a one-sentence conclusory decision upholding the ACPE Board of Directors' decision.

## CLAIMS

### COUNT I - ACPE ARBITRARILY AND CAPRICIOUSLY
### DECIDED TO REVOKE HAMPTON UNIVERSITY'S ACCREDITATION

69.     Hampton adopts and incorporates herein each of the foregoing paragraphs.

70.     The Court must review an accrediting body's internal rules and procedures to determine whether the rules provide for a fair and impartial procedure and whether the accrediting body followed its own rules and policies in reaching its decision. *See W. Va. Bus. Coll. v. Accrediting Council for Indep. Colls. & Schs*, 2019 U.S. Dist. LEXIS 102940, at *13 (E.D. Va. June 2019).

71.     An accreditation body's decision is invalid if it is arbitrary or unreasonable, or if the decision is not supported by substantial evidence. *See United States English Language Ctr. v. Accrediting Council for Higher Educ. & Training, Inc.*, 2019 U.S. Dist. LEXIS 226368, at *1 (E.D. Va. September 2019); *SFAHP Mgmt. v. Accreditation Bureau of Health Educ. Sch., Inc.*, 2015 U.S. Dist. LEXIS 184310, at *7 (E.D. Va. Aug. 2015); *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 290 F. Supp. 3d 463, 470 (E.D. Va. 2018).

72.     An agency's action is arbitrary if the agency fails to follow its own procedures or policies in reaching its decision. *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs*, 691 F. App'x 737, 741 (4th Cir. 2017).

73.     ACPE's decision to withdraw HUSOP's accreditation is arbitrary, unreasonable, and not supported by substantial evidence because ACPE failed to comply with its own policies and procedures before withdrawing HUSOP's accreditation.

74.     ACPE violated its policies and procedures in the process of withdrawing HUSOP's accreditation, which automatically renders its decision invalid. Among other violations, ACPE repeatedly failed to include a statement of reasons for its probation decisions in the A&R Reports

in violation of Policy 9.3.1; ACPE also failed to include an "outline of the requirements for bringing the standards into compliance" in the A&R Reports, in violation of Policy 11.5.1.

75.     Further, ACPE's failure to inform HUSOP that it was using four thresholds from an entirely separate policy to evaluate HUSOP's compliance with Standard 17 was unreasonable, and withdrawing the School's accreditation based on this lack of communication is equally unreasonable. Because ACPE's evaluative reports never mentioned these four thresholds or the policy in which they are found, HUSOP had no reason to know what compliance concerns ACPE actually had, which meant HUSOP had no way of knowing what actions it needed to take so it could become compliant with Standard 17 according to the metrics being utilized by the Board. This necessarily impacted HUSOP's ability to remedy the actual issues underlying ACPE's decision to withdraw HUSOP's accreditation.

76.     Perhaps most unreasonable is ACPE's clear decision to completely ignore the ongoing role it played in HUSOP's alleged "non-compliance" with these four thresholds. ACPE *heavily* encouraged HUSOP to implement quality improvements at a rapid pace and even stated on several occasions that ACPE anticipated said rapid implementation to negatively impact HUSOP's progression numbers. Once HUSOP put these suggested improvements into place and the subsequent results turned out just as ACPE projected and expected, ACPE acted as if it had no idea why HUSOP's progression numbers had been impacted so significantly. Adding insult to injury, ACPE went a step further and proceeded to penalize HUSOP for these numbers. Had HUSOP known that following ACPE's instructions would lead to its accreditation being withdrawn, HUSOP would have been more hesitant to adopt ACPE's recommendations.

77.     Also, ACPE's failure to inform HUSOP that it was basing its accreditation determination on projections about HUSOP's future classes was unreasonable. These projections

were based on un-vetted, incomplete data that was **never** previously requested by ACPE. The only reason ACPE had this information is because HUSOP happened to provide it orally to the Board in response to a Board member's question. There was absolutely no discussion about the data or an opportunity to explain it.  In addition, HUSOP presented the data with the understanding that it was speculative; it had no idea the Board was going to hang HUSOP's existence on inherently incomplete data.

78.     What is more, for this future class data to have been so pivotal or, as ACPE put it, "primary," ACPE never asked any questions about the data during the presentation, and ACPE did not cite these data points in its evaluative reports or even in its withdrawal decision. ACPE's failure to inform HUSOP that future classes' data was relied on to make decisions about HUSOP's accreditation status was unreasonable, and basing a withdrawal determination on this is equally unreasonable.

79.     As a result of ACPE's failure to identify its compliance concerns in full to HUSOP, HUSOP was at an immediate disadvantage, as there would have been no way for HUSOP to fix all the issues that ACPE considered significant. In turn, if HUSOP were unable to fix the issues that ACPE actually considered significant or troublesome, then HUSOP would inevitably remain on probation.

80.     Due to the fact that ACPE withdrew HUSOP's accreditation after ACPE failed to follow its own policies on several occasions, and that ACPE's failure to follow its policies that afford due process meant that HUSOP never received the guidance it needed in order to be deemed to be in compliance with Standard 17, ACPE's withdrawal decision must be invalidated.

81.     Hampton has been and will continue to be irreparably harmed—including the extinction of its School of Pharmacy, damage to its reputation, and other non-monetary damages—

by ACPE's failure to follow its own rules. As such, Hampton is entitled to injunctive relief. Hampton has also suffered substantial monetary damages, including loss of tuition, costs associated with the appeals process, and other damages.

### COUNT II - VIOLATION OF COMMON LAW DUE PROCESS

82.     Hampton adopts and incorporates herein each of the foregoing paragraphs.

83.     Separate from its due process obligations under federal regulations, ACPE has a common law duty to employ fair procedures when making decisions that affects its members. *Wards Corner Beauty Acad,* 290 F. Supp. 3d at 470.

84.     To satisfy this obligation, ACPE was required to provide HUSOP clear notice about ACPE's compliance concerns before withdrawing HUSOP's accreditation. ACPE also had an obligation to provide HUSOP with notice about any different approach it chose to adopt in order to enforce its policies.

85.     ACPE breached its common law duty when it failed to provide HUSOP with adequate notice as to its compliance concerns before deciding to withdraw HUSOP's accreditation. To date, ACPE has provided HUSOP with evaluative reports that are filled with conflicting information; ACPE has provided conflicting updates to HUSOP about its compliance status; ACPE failed to inform HUSOP that it was using thresholds from Policy 11.6.3 to evaluate HUSOP's compliance with Standard 17; and, despite its evaluative reports, ACPE repeatedly failed to inform HUSOP about the "primary" concerns underlying ACPE's withdrawal determination—data about HUSOP's future 2020 and 2021 classes. HUSOP did not learn about this "primary data point" until the hearing before the Appellate Commission in April, which was after the Board withdrew HUSOP's accreditation.

86.     ACPE's failure to inform HUSOP that it was considering HUSOP's un-vetted, speculative data about HUSOP's future classes of 2020 and 2021 when deciding whether to withdraw HUSOP's accreditation also constituted a failure to provide notice and a breach of ACPE's common law duty.

87.     Because HUSOP was not given notice about ACPE's actual compliance concerns, HUSOP was never able to adequately address ACPE's concerns underlying the withdrawal determination during the appeal process; this necessarily means HUSOP had not been provided a meaningful chance to be heard. Had HUSOP known that other compliance issues were being considered, it would have addressed them in its written reports and spoken about them in its oral presentation to the ACPE Board.

88.     As a result, Hampton has been irreparably harmed by ACPE's failure to provide notice and a meaningful opportunity to be heard prior to revoking HUSOP's accreditation. Each of these omissions amounts to a violation of HUSOP's common law due process rights, and Hampton is entitled to injunctive relief.

## COUNT III - FAILURE TO SERVE AS AN IMPARTIAL, UNBIASED DECISION MAKER

89.     Hampton adopts and incorporates herein each of the foregoing paragraphs.

90.     "An impartial decisionmaker is an essential element of due process . . . regardless of whether a district court is addressing a constitutional due process claim or a claim grounded in the common law right to fair procedure." *Wards Corner Beauty Acad.*, 290 F. Supp. 3d at 469.

91.     Once a party makes "a strong showing of bad faith or improper behavior" exhibited by a decision maker, the Court must conduct "a more searching inquiry into the motivations of [the] administrative decisionmakers." *Id.* While "[a]n administrative decisionmaker is entitled to a presumption of honesty and integrity," a party can overcome this presumption by presenting

"evidence demonstrating that an adjudicator has a 'personal bias.'" *Id.* (internal quotation marks omitted) (finding that the plaintiff presented sufficient evidence to warrant an evidentiary hearing because it identified "disputed material facts that were not adjudicated during the accreditation review process and that bore on whether Plaintiff was denied its right to an 'impartial decisionmaker'").

92.     Since placing HUSOP on probation in 2017, ACPE has acted partially and out of bias when evaluating HUSOP's program and accreditation status. This is glaringly obvious based on a surface-level review of comments made by ACPE to HUSOP and ACPE's course of dealing with HUSOP since the 2017 probation.

93.     According to ACPE's own words, the agency has resented HUSOP since HUSOP sued ACPE in 2009 over the agency's earlier probation decision. While the more recent accreditation decision at issue in this case is distinct from the 2009 decision, ACPE is currently weaponizing its accreditation power in order to exact revenge on HUSOP for the program's earlier lawsuit, a move the agency clearly considered (and still considers) gumptious. This much has been confirmed by caustic comments made to HUSOP by ACPE representatives and Board members about the prior lawsuit and "long history" between the two, connoting that HUSOP was somehow already indebted to ACPE and needed to focus on ingratiating itself in order to have its accreditation fully restored.

94.     In addition, by stating that ACPE gave HUSOP "the rope" with which to hang itself, ACPE's representatives also confirmed that the deck had been stacked against HUSOP from the beginning, and the agency had no intention of seeing HUSOP flourish to become a successful program.

95.     Further, there were myriad material facts that were not adjudicated during the accreditation review process, and this is likely because ACPE had no interest in affording HUSOP an opportunity to explain or defend itself before it had its accreditation withdrawn. Had ACPE asked HUSOP a *single* question about HUSOP's future graduates, HUSOP would have openly stated that the only data it currently had was incomplete, speculative, un-vetted, and certainly not strong enough to serve as the **primary** support for revoking the School's accreditation. Moreover, that single question would have invited HUSOP to explain why its future data, albeit incomplete, was strong evidence that it was actively strengthening its program by culling its cohort of poorly performing students. Instead, ACPE withdrew HUSOP's accreditation and then, during the appeal hearing months later, revealed to HUSOP for the first time that it relied on the incomplete future data without context when it decided to revoke the school's accreditation. Based on ACPE's own testimony, this future data was clearly material, yet the parties never discussed—and certainly never adjudicated—the authenticity, veracity, or accuracy of the data, much less its meaning.

96.     Due to ACPE's obvious bias, Hampton has been irreparably harmed by ACPE's failure to serve as an impartial decision maker prior to revoking HUSOP's accreditation. This omission amounts to a violation of HUSOP's common law due process rights, and Hampton is entitled to injunctive relief.

## COUNT IV - VIOLATION OF DUE PROCESS UNDER THE HIGHER EDUCATION ACT

97.     Hampton adopts and incorporates herein each of the foregoing paragraphs.

98.     The Higher Education Act of 1965 requires certain agencies, including ACPE, to "apply procedures throughout the accrediting process . . . that comply with due process." 20 U.S.C. § 1099b(a)(6).

99.     ACPE must comport with due process by providing accredited programs with adequate notice and an opportunity to be heard when rendering decisions and taking actions that will impact its member-institutions' eligibility to participate in programs that provide federal aid to higher-education programs.

100.    ACPE violated Hampton's due process rights when it decided to withdraw Hampton's accreditation after failing to provide adequate notice as to the Board's reasons for finding HUSOP non-compliant and partially compliant, as well as for failing to set forth requirements for HUSOP to bring itself into Standard 17 compliance, both of which are required by its own policies and procedures. ACPE also violated HUSOP's due process rights by resting its withdrawal decision on reasons and assessments that were never discussed with HUSOP prior to its accreditation being withdrawn. Specifically, ACPE's due process omissions started with its 2016 A&R and carried straight through to its 2020 A&R.

101.    As such, Hampton has been irreparably harmed by ACPE's violation of its due process rights and is entitled to injunctive relief.

## COUNT V - VIOLATION OF 42 U.S.C. § 1981

102.    Hampton adopts and incorporates herein each of the foregoing paragraphs.

103.    Hampton has the right to enjoy the "benefits, privileges, terms, and conditions" of its contractual relationship with ACPE in the same manner that other non-predominantly Black institutions enjoy their rights under their contracts with ACPE.

104.    ACPE intentionally discriminated against Hampton as a predominately Black institution by holding it to more stringent standards than those set forth in its policies and more stringent than those applied to similarly situated pharmacy programs primarily made up of white students.

105.    This conduct was intended to treat HUSOP differently and less favorably than similarly situated institutions that are primarily white.

106.    This is further supported by the caustic, racially motivated words (giving Hampton the "rope" to hang itself) used by an ACPE representative.

107.    As a result, ACPE's actions violated HUSOP's rights guaranteed by 42 U.S.C § 1981. Specifically, ACPE violated HUSOP's right to be free from discrimination in (a) the formation of its contract with ACPE, (b) the performance, modification, and termination of its contract with ACPE, (c)  enjoyment of all benefits, privileges, terms and conditions of its contract with ACPE, and (d) enjoyment of its contracts free from interference with its right to enforce its contractual obligation.

108.    ACPE has repeatedly subjected HUSOP, a historically and predominantly Black institution, to non-existent standards or hyper-technical, unreasonable interpretations of its standards, while using less stringent standards (and, in many instances, completely different standards) when evaluating comparably regulated institutions that are predominately white.

109.    Because of the ACPE's failure to enforce its contract with HUSOP in a non-discriminatory manner, Hampton is entitled to injunctive relief against ACPE's racially discriminatory conduct.

110.    Hampton has been and will continue to be irreparably harmed by ACPE's conduct. If the Court does not grant injunctive relief, Hampton will continue to incur damages, including, but not limited to, reputational damage, loss of current and future Title IV Program Funding, loss of goodwill, loss of current and future students, loss of current and future faculty and staff, and the wholesale shutdown of its School of Pharmacy.

## COUNT VI - TORTIOUS INTERFERENCE WITH CONTRACT
### (Hampton University's Program Participation Agreement
### with the Department of Education)

111.    Hampton adopts and incorporates herein each of the foregoing paragraphs.

112.    Once an educational institution receives accreditation from ACPE, the institution may be eligible to enter into a contract with the DoE in order to receive Title IV Program Funding.

113.    This contract is referred to as a Program Participation Agreement, and it sets forth the reciprocal rights and responsibilities of the school and the DoE.

114.    An overwhelming majority of students who enroll at HUSOP must receive grants and/or loans under the Title IV Programs to fund their tuition and living costs.

115.    ACPE had actual knowledge about HUSOP's eligibility for Title IV Program Funding and, consequently, about Hampton's contract with the DoE.

116.    ACPE knew HUSOP's eligibility to receive Title IV Program Funding for its students depends on receiving accreditation from ACPE.

117.    By withdrawing HUSOP's accreditation, ACPE intentionally and knowingly prevented HUSOP from performing under its contract with the DoE.

118.    Due to ACPE's tortious, willful interference with HUSOP's contractual relationship with the DoE, ACPE has directly and proximately caused Hampton to incur damages, including, but not limited to, loss of Title IV Program Funding, reputational damage, loss of future and current students, loss of faculty, and the wholesale shutdown of its School of Pharmacy.

## COUNT VII - TORTIOUS INTERFERENCE WITH CONTRACT
### (Hampton University's Student Enrollment Agreements)

119.    Hampton adopts and incorporates herein each of the foregoing paragraphs.

120.    Once an institution receives accreditation from ACPE, the institution is eligible to enter into contracts or business relationships with students in order to provide for their enrollment.

121.    HUSOP enters into enrollment agreements with its students, which set forth the school's responsibilities and the students' responsibilities as contracting parties. Students enter into these agreements with HUSOP largely due to the school's accreditation from an agency that is recognized by the DoE.

122.    ACPE had actual knowledge about HUSOP's contract with its students.

123.    ACPE knew that HUSOP would be unable to maintain its contractual relationships with its students if it does not maintain its accreditation.

124.    ACPE intentionally and knowingly interfered with HUSOP's contractual relationships with its students by groundlessly revoking HUSOP's accreditation.

125.    Due to ACPE's tortious, willful interference with HUSOP's contractual relationships with its students, ACPE has directly and proximately caused Hampton to incur damages, including, but not limited to, reputational damage, loss of current and future students and their tuition payments, loss of faculty, and the wholesale shutdown of its School of Pharmacy.

## COUNT VIII - TORTIOUS INTERFERENCE WITH  HUSOP'S PROSPECTIVE BUSINESS OR ECONOMIC ADVANTAGE

126.    Hampton adopts and incorporates herein each of the foregoing paragraphs.

127.    HUSOP enters into Enrollment Agreements with its students, and these agreements set forth the school's responsibilities and the students' responsibilities as contracting parties.

128.    ACPE knows that Hampton enters into these agreements with its students.

129.    ACPE's intentional termination of HUSOP's accreditation without due process has caused or will inevitably cause current students to withdraw from HUSOP. HUSOP's current students would continue fulfilling their obligations under their Enrollment Agreements, including providing tuition payments, if ACPE had not tortiously and intentionally withdrawn HUSOP's accreditation.

130.   ACPE knew that HUSOP would attract new students who would enter into enrollment agreements with the institution.

131.   ACPE's intentional, groundless termination of HUSOP's accreditation has caused, and will cause, students to stop enrolling in the institution. Future students would enter into Enrollment Agreements and pay tuition if ACPE had not tortiously and groundlessly withdrawn HUSOP's accreditation.

132.   Due to ACPE's intentional interference with HUSOP's prospective contractual relationships, ACPE has directly and proximately caused Hampton to incur damages, including, but not limited to, reputational damage, loss of current and future Title IV Program Funding, loss of goodwill, loss of current and future students, and the wholesale shutdown of its School of Pharmacy.

## COUNT IX - DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

133.   Hampton adopts and incorporates herein each of the foregoing paragraphs.

134.   According to the Federal Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, the district court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 441 (E.D. Va. 2018).

135.   A district court has "unique and substantial discretion in deciding whether to declare the rights of litigants" pursuant to 28 U.S.C. § 2201. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1996).

136.   The Court must consider (1) whether a judgment "will serve a useful purpose in clarifying and settling the legal relations in issue," and (2) "whether it will terminate and afford

relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Hopeman Bros., Inc.* 307 F. Supp. 3d at 441-42.

137.    In this case, a declaratory judgment will serve a useful purpose in clarifying and settling several legal relations that are currently at the heart of this lawsuit.

138.    Specifically, based on the above, Hampton requests a declaratory judgment stating the following:

(1) That the limited process that ACPE afforded to HUSOP before withdrawing HUSOP's accreditation violated HUSOP's due process rights and therefore the action must be found null and void;

(2) That ACPE failed to abide by its own policies and procedures when evaluating HUSOP and ultimately withdrawing HUSOP's accreditation and, therefore, the action must be found null and void;

(3) That ACPE violated the Higher Education Act by failing to provide HUSOP with appropriate due process protections, including notice, before withdrawing its accreditation and that such action must be found null and void;

(4) That ACPE's decision to withdraw HUSOP's accreditation was arbitrary and unreasonable, and it is not supported by the record; and

(5) That ACPE's decision was retaliatory and racially motivated.

139.    By providing a ruling on the foregoing constitutional and legal questions, the Court will afford Hampton relief from the current uncertainty, insecurity, and controversy giving rise to this proceeding.

## DAMAGES

As a result of ACPE's actions, Hampton has been and will continue to be irreparably harmed. Hampton's damages include, but are not limited to:

(1)     Damage to the School's ability to receive federal funding;

(2)     Damage to the School's ability to attract and retain quality students, faculty, and staff;

(3)     Reputational harm based on the institution's academic ranking and standing;

(4)     Damage to the School's ability to substantially contribute to providing graduate education opportunities to African Americans. *See* 34 C.F.R. § 609.2;

(5)     The extinction of Hampton's School of Pharmacy;

(6)     Loss of revenue, including tuition dollars and other revenue; and

(7)     Costs and fees, including attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Hampton seeks the following relief:

(1)     A judgment entered pursuant to 28 U.S.C. § 2201(A) declaring:

(a)     that the limited process that ACPE afforded to HUSOP before withdrawing HUSOP's accreditation violated HUSOP's due process rights and therefore the action must be found null and void;

(b)     that ACPE failed to abide by its own policies and procedures when evaluating HUSOP and ultimately withdrawing HUSOP's accreditation and, therefore, the action must be found null and void;

(c)     that ACPE violated the Higher Education Act by failing to provide HUSOP with appropriate due process protections, including notice, before

withdrawing its accreditation and that such action must be found null and void;

(d)    that ACPE's decision to withdraw HUSOP's accreditation was arbitrary and unreasonable, and it is not supported by the record; and

(e)    that ACPE's decision was retaliatory and racially motivated.

(2)    Injunctive relief in the form of a preliminary and permanent injunction:

(a)    enjoining ACPE from withdrawing HUSOP's accreditation status;

(b)    enjoining ACPE from posting about HUSOP's withdrawn accreditation in any of its publications, including, but not limited to, its website or other literature; and

(c)    enjoining ACPE from informing any entity or person, including the Secretary of Education, about its decision to withdraw HUSOP's accreditation or, in the event ACPE has already dispersed such notification, requiring ACPE to withdraw the notification provided to the entity or party.

(3)    An order requiring ACPE to provide HUSOP with adequate notice, which includes notice as to ACPE's actual compliance concerns underlying its recent decision to withdraw HUSOP's accreditation;

(4)    An order requiring ACPE to conduct a full hearing on the issues that are disclosed as part of the notice provided pursuant to (3);

(5)    In the alternative, an award, including compensatory and consequential damages, in an amount to be determined at trial as well as pre- and post-judgment interest;

(6)    A punitive damages award to be determined at trial;

(7)    An award of attorneys' fees and other costs and expenses of litigation; and

(8)     Any other relief that the Court deems just and equitable.


Respectfully submitted,

By: /s/ Nathan A. Kottkamp
Nathan A. Kottkamp
Virginia Bar No. 47059
WALLER LANSDEN DORTCH & DAVIS, LLP
2920 W Broad Street, Suite 40
Richmond, Virginia 23230
Phone:  (615) 244-6380
Fax:  (615) 244-6804
nathan.kottkamp@wallerlaw.com

Aron Z. Karabel, *pro hac vice* pending
John E. Haubenreich, *pro hac vice* pending
Karolyn Perry, *pro hac vice* pending
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
Phone:  (615) 244-6380
Fax:  (615) 244-6804
aron.karabel@wallerlaw.com
john.haubenreich@wallerlaw.com
karolyn.perry@wallerlaw.com

*Attorneys for Plaintiff, Hampton University*