IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| HAMPTON UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  4:20cv118 (RCY) |
| | ) | |
| ACCREDITATION COUNCIL FOR | ) | |
| PHARMACY EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on three motions: Plaintiff's Motion for Leave to Amend Its Complaint ("Motion to Amend") (ECF No. 75); Plaintiff's Motion to Supplement the Administrative Record (ECF No. 79); and Plaintiff's Motion for Additional Discovery and for a Scheduling Order ("Discovery Motion") (ECF No. 81).  The motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated herein, Plaintiff's Motion to Amend will be granted, Plaintiff's Motion to Supplement the Administrative Record will be denied, and Plaintiff's Discovery Motion will be granted in part and denied in part.

**I. BACKGROUND**

Hampton University ("Hampton" or "Plaintiff") brings this lawsuit to stop the withdrawal of accreditation of its School of Pharmacy ("HUSOP") by the national licensing body for pharmacy schools, the Accreditation Council for Pharmacy Education ("ACPE" or "Defendant").

Hampton University is a member of the Historically Black Colleges and Universities (HBCUs) and is based in Hampton, Virginia.  (Compl., ECF No. 1 ¶ 1.)  Hampton explains that

its school of pharmacy is "the second-largest producer of African-American pharmacists in the United States," and that over 96% of HUSOP's graduates reported working in medically underserved communities around the country.  (*Id.* ¶¶ 6, 10.)

ACPE is a Department of Education-recognized national accrediting agency for pharmacy schools.  (*Id.* ¶ 2.)  This Department of Education recognition grants ACPE significant power with respect to pharmacy programs because its accreditation gives pharmacy schools access to critical federal funding programs and determines whether graduates can practice pharmacy in certain states, including Virginia.  (*Id.*); *see* 20 U.S.C. § 1099b(j); Va. Code § 54.1-3312.  It should be noted that HBCUs in particular may face a paradox with regard to university accreditation: "by catering to underserved minorities and low-income students, HBCUs often lack the educational and financial resources necessary to satisfy accreditation standards based on the archetype of predominately-white institutions . . . but without the accreditation required for federal funding, HBCUs are unable to develop resources and infrastructure."  Jamie L. Wershbale, *Collaborative Accreditation: Securing the Future of Historically Black Colleges*, 12 Berkeley J. Afr.-Am. L. & Pol'y 67, 68 (2010).

Hampton's suit brings nine claims for relief.[1]  Its central contention is that it was denied due process with respect to accreditation.   According to Hampton, ACPE was not sufficiently

---

[1] Plaintiff's claims are as follows:

Count I: ACPE arbitrarily and capriciously decided to revoke Hampton University's Accreditation;
Count II: Violation of common law due process;
Count III: Failure to serve as an impartial, unbiased decision maker;
Count IV: Violation of due process under the Higher Education Act;
Count V: Violation of 42 U.S.C. § 1981;
Counts VI and VII: Tortious interference with contract;
Count VIII: Tortious interference with HUSOP's prospective business or economic advantage; and
Count IX: Declaratory Judgment pursuant to 28 U.S.C. § 2201.

(Compl. at 19-31.)

forthcoming about the basis for putting the program on probation and then withdrawing its accreditation, simply invoking accreditation Standard 17 regarding "Progression" of students without detailing the factual basis for finding Hampton out of compliance.  Hampton asserts that it was led to believe, through communications and consultations between 2017 and 2019, that ACPE was encouraged by Hampton's progress, and that ACPE's concerns centered on passage rates on the North American Pharmacist Licensure Examination ("NAPLEX").  Hampton was allegedly surprised to find out, during its appeal of the withdrawal of accreditation, that ACPE's primary basis for the withdrawal arose from concerns about one of Hampton's representatives' answers to a question about the projections for on-time graduation of the 2020 and 2021 cohorts at an ACPE Board meeting in January 2020.

Hampton's complaint alleges that racial animus and prejudice motivated the withdrawal of accreditation, pointing to an ACPE officer's statement to Hampton officials that ACPE gave Hampton "the rope" by granting an eight-year accreditation term back in 2014.  Hampton also references the potential for prejudice based on the fact that the parties allegedly have an acrimonious relationship dating back to a 2009 lawsuit filed by Hampton.

A. ACPE's Withdrawal of HUSOP's Accreditation

On January 25, 2020, at the conclusion of multiple years of program monitoring and over two years of probation, the ACPE Board of Directors ("ACPE Board") issued an Accreditation Action and Recommendations Report ("A&R") that withdrew HUSOP's accreditation as a pharmacy school "for issues of compliance" with "Standard No. 17: Progression."  (ECF No. 56-2 at 543-44.)  Hampton filed a notice of appeal of the ACPE Board's decision in February, and a Zoom hearing was held before the ACPE Appellate Commission on April 28, 2020.  On June 11, 2020, the ACPE Appellate Commission affirmed the withdrawal of HUSOP's accreditation in a

one-page report. (ECF No. 56-2 at 552.) The withdrawal was formalized with the issuance of the ACPE Board's July 29 - August 1, 2020 Accreditation Action and Recommendations Report. (ECF No. 55-2 at 221.)

The ACPE Board's final action came at the end of a long process involving multiple years of oversight by ACPE, including its customary annual monitoring and periodic reviews. In January 2015, ACPE issued an A&R that extended HUSOP's accreditation through June 30, 2023. (ECF No. 55-1 at 1016.) This A&R was based in part on HUSOP's production of an 896-page self-study report and accompanying documents, as well as a November 2014 ACPE Evaluation Team site visit and report. (*See* Evaluation Team Report, ECF No. 55-1 at 938.) However, this eight-year accreditation period had some strings attached. ACPE reserved the right to reconsider accreditation, and HUSOP was subject to monitoring and review of various areas of concern, including ACPE Standard 19: Progression of Students.[2]

Not long after HUSOP's accreditation was extended, it began triggering ACPE monitoring thresholds for significant underperformance on licensing and student progression metrics.[3] In July of 2015, ACPE staff sent a letter to the HUSOP Dean regarding concerns with the NAPLEX scores, graduation rates, and academic dismissals for the HUSOP class of 2014. (ECF No. 55-1 at 1024-25.) The test scores for this class were more than two standard deviations below the national average, and the class of 2014 had a 6.3% academic dismissal rate, which exceed ACPE's monitoring threshold. ACPE's letter mentioned the then-existing student progression standard,

---

[2] The "Progression" standard became Standard 17 with ACPE's 2016 adoption of revised standards.
[3] ACPE uses data obtained from the American Association of Colleges of Pharmacy ("AACP") to track student progression metrics, including the percentage of academic dismissals, withdrawals, and delayed graduations, as well as the attrition rate for each cohort. Similarly, ACPE uses date from the National Association of Boards of Pharmacy ("NABP") to track the performance of program graduates on the NAPLEX professional licensing exam. ACPE sends monitoring letters to schools when a troubling "threshold" is triggered. This occurs when a program's metrics in any category fall more than two standard deviations below the national average for that metric in the case of NAPLEX scores, and two-to-three times higher than the national average for the various progression metrics. (*See, e.g.*, ECF No. 55-1 at 1024.)

Standard 19.  In 2016, HUSOP received a similar monitoring letter from ACPE, indicating that it had again tripped the ACPE monitoring thresholds for NAPLEX scores and student progression (based on a 17.4% delayed graduation rate for the class of 2015).  (ECF No. 55-1 at 1027-28.) ACPE found HUSOP to be non-compliant with Standard 19, and asked HUSOP to bring representatives to the January 2017 ACPE Board meeting to address these concerns.  In a follow-up letter from this board meeting, ACPE indicated that "the Board remains unconvinced the School is approaching these issues as aggressively as warranted.  Consequently, the School is asked to prepare a detailed action plan . . . ."  (ECF No. 55-1 at 1036.)

Multiple years of back and forth between ACPE and HUSOP ensued, with HUSOP presenting action plans detailing programmatic changes, and ACPE issuing A&Rs on HUSOP's accreditation.[4]  These reports repeatedly detailed issues with the progression standard, and in a June 2017 A&R, ACPE placed HUSOP on probation based on issues with the progression standard as well as Standard 10.[5]  (ECF No. 55-1 at 1050.)  The report included the following:

> The Board expresses its continued dismay at the lack of urgency conveyed in the Detailed Action Plan submitted April 5, 2017.  Additionally, the Board expresses its grave concern that the School's NAPLEX® pass rates have consistently fallen under two standard deviations below the mean of the national passing rate for a number of years (i.e., 2011, 2013, 2014, 2015, 2016, and 2017).  Efforts taken by the School to improve NAPELX® pass rates to date have not been successful.

(ECF No. 55-1 at 1054.)

---

[4] HUSOP filed an action plan in April 2017.  (ECF No. 55-1 at 1037.)  The ACPE Board issued an A&R in June 2017 that placed HUSOP on probation due to compliance issues with Standards 10 and 17 (progression).  (ECF No. 55-1 at 1050.)  The parties continued to exchange correspondence, including more monitoring letters from ACPE.  HUSOP filed an updated report in October 2017, (ECF No. 55-1 at 1082), and ACPE conducted a site visit and issued a Focused On-Site Evaluation Team Report ("ETR") in November 2017.  (ECF No. 55-1 at 1118.)  HUSOP filed an updated report, (ECF No. 55-2 at 35), ahead of ACPE issuing another A&R in January 2018.  (ECF No. 55-2 at 51.)  HUSOP filed an interim report in April 2018, and ACPE issued an A&R in June 2018 that affirmed HUSOP's accreditation but continued the program on probation.  (ECF No. 55-2 at 81.)  HUSOP filed a thirty-five page report in October 2018 and a nine-page supplement in January 2019, ahead of ACPE issuing another A&R in January 2019.  (ECF No. 55-2 at 137.)  HUSOP issued another report in October 2019, (ECF No. 55-2 at 158), and a January update ahead of the ACPE Board's January 2020 A&R, which withdrew HUSOP's accreditation.  (ECF No. 55-2 at 208.)

[5] Standard 10 addressed Curriculum Design, Delivery and Oversight.  (ECF No. 55-1 at 1051.)  By the January 2019 A&R, this standard was deemed "Complaint with Monitoring."  (ECF No. 55-2 at 141.)

ACPE conducted a site visit in the fall of 2017 and issued a report that found HUSOP partially compliant with Standard 17,[6] noting that "some of the changes made are very recent and will thus take some time to demonstrate results."  (ECF No. 55-2 at 11.)  As this process went on, ACPE continued to renew HUSOP's accreditation while keeping it on probation for progression issues.  This was until in January 2020, when it withdrew HUSOP's accreditation.  It explained:

> The Board expresses its continued dismay at the lack of urgency conveyed in the School's responses to the Board's continuing concerns about student progression. The Board also expresses grave concern that the changes made by the program have not resulted in significant outcomes to improve progression and attrition percentages.  Standard No. 17 was first found to be non-compliant in June 2016 (under Standard No. 19 respectively in Standards 2007).

(ECF No. 55-2 at 210.)  The Board also noted concerns about HUSOP's NAPLEX pass rates and found the school to be only "partially compliant" with Standard 24 regarding educational outcomes.  (*Id.*)

Pursuant to ACPE's policies, Hampton filed a timely notice of appeal of the Board's

---

[6] Standard 17 provides as follows:

**Standard 17: Progression**
The college or school develops, implements, and assesses its policies and procedures related to student progression through the PharmD program.
**Key elements**:
**17.1. Progression policies** – The college or school creates, makes available to students and prospective students, and abides by criteria, policies, and procedures related to:
- Academic progression
- Remediation
- Missed course work or credit
- Academic probation
- Academic dismissal
- Dismissal for reasons of misconduct
- Readmission
- Leaves of absence
- Rights to due process
- Appeal mechanisms (including grade appeals)

**17.2. Early intervention** – The college or school's system of monitoring student performance provides for early detection of academic and behavioral issues. The college or school develops and implements appropriate interventions that have the potential for successful resolution of the identified issues.

(ECF No. 56-2 at 216.)

adverse action, which temporarily suspended the withdrawal while the appeal was pending.  (ECF No. 56-1 at 1-3.)  Ultimately, after an appellate hearing, the ACPE Appellate Commission affirmed the withdrawal in a short report issued on June 11, 2020.  (ECF No. 56-2 at 552.)  The ACPE Board finalized the withdrawal with an August 2020 A&R.  (ECF No. 55-2 at 221.)

B. Procedural History

Plaintiff filed its Complaint on July 23, 2020.  Contemporaneously, Plaintiff filed a motion for a temporary restraining order ("TRO") to enjoin the Defendant from formally withdrawing HUSOP's accreditation at the upcoming July 29 ACPE Board meeting.

Shortly after the case was filed along with a motion for a temporary restraining order, the Court denied the request for a TRO.  (ECF No. 14.)  The Court's Order highlighted the fact that Plaintiff waited six weeks from the ACPE Appellate Commission's June 11 decision affirming the withdrawal of accreditation to file the motion.  (*Id.* at 4-5.)

Next, the Court considered Plaintiff's motion for expedited discovery, which it requested in order to prepare its motion for preliminary injunction.  (ECF No. 28.)  On August 20, the Court partially granted the expedited discovery motion, allowing "[l]imited expedited discovery into the possible existence of bias or prejudice . . . ."  (*Id.* at 3.)  While the Court explained that Hampton "has adequately alleged bad faith to warrant limited supplementation of the administrative record," (*Id.* at 8 (citing a potentially "racial comment" by ACPE staff and references to previous lawsuit)), it indicated that Hampton was "not permitted to seek wide-ranging discovery into the administrative decision-making process."  (*Id.* at 3.)

Expedited discovery proceeded from late August to early October.[7]  On August 28, Defendant produced the Administrative Record to Hampton.  Through October 7, the parties

---

[7] In the meantime, on September 1, 2020, Defendant filed a partial motion to dismiss.  (ECF No. 31.)

conducted twenty depositions, which were limited to two hours each under Court's expedited discovery order.   Seventeen of the deponents were ACPE witnesses whose testimony was presumably sought by Hampton.   (Def.'s Resp. Opp'n Mot. Amend, ECF No. 78 at 3-4.)

Plaintiff filed its Motion for Preliminary Injunction on October 16, 2020.   Three days later, the action was reassigned to the undersigned.   As briefing ensued, ACPE filed the Administrative Record on the docket on October 30, 2020.   (ECF Nos. 52-57.)   The Administrative Record exceeds 6,000 pages, and purportedly comprises documents considered by the ACPE Board and the ACPE Appellate Commission in reaching their respective accreditation decisions.   On November 6, the Motion for Preliminary Injunction became ripe with Plaintiff's Reply.   (ECF No. 66.)

Two weeks later, on November 23, 2020, Defendant filed a Motion for Summary Judgment.   (ECF No. 69.)   Briefing was extended to account for the Thanksgiving and Christmas holidays, and the motion became ripe on January 8, 2021.   (ECF No. 74.)

Approximately one month later, on February 5, 2021, Plaintiff filed a Motion for Leave to Amend Its Complaint ("Motion to Amend").   (ECF No. 75.)   Then, on February 25, 2021, Plaintiff filed two more motions: a Motion to Supplement the Administrative Record (Mot. Supplement, ECF No. 79), and a Motion for Additional Discovery and for a Scheduling Order (Disc. Mot., ECF No. 81.)   The motions have since ripened.

C. Administrative Record

As noted above, on October 30, 2020, ACPE filed the Administrative Record in conjunction with its Response in Opposition to Plaintiff's Motion for Preliminary Injunction. (ECF Nos. 52-57.)   The Administrative Record totals over 6,000 pages, with 4,601 pages comprising documents presented to the ACPE Board and 1,456 pages comprising documents

8

presented to the ACPE Appellate Commission.  (*See* ECF No. 52-1.)  ACPE states that this compilation of documents is the complete record considered by the ACPE Board and the ACPE Appellate Commission ahead of their respective decisions.  ACPE explains:

> The Record, which supports ACPE's Response in Opposition to Preliminary Injunction and ACPE's Motion for Summary Judgment, consists of all documents that were available for the Board's consideration at the time of its decision to withdraw in January of 2020. The Record also contains all documents that were produced to and for the Appellate Commission by both HUSOP and ACPE at the time of the Appellate Commission's decision on June 11, 2020.

(Resp. Opp'n Mot. Supplement, ECF No. 84 at 5.)

Clearly, the purported record is voluminous, though there is a fair amount of it that is duplicative or relatively ancillary to ACPE's accreditation decisions.[8]  The record of documents considered by the Board includes thousands of pages of documents submitted to ACPE by HUSOP itself.  The documents start with ACPE monitoring letters dating back to July 2009 and provide a record of ACPE's A&Rs regarding HUSOP leading up to the eight-year extension granted in 2015. This includes HUSOP's self-study report, an 896-page comprehensive review of Hampton's own program that addressed in detail its performance relative to each of the ACPE accreditation standards.  (*See* ECF No. 54-3 at 236; ECF No. 55-1 at 1.)  It also includes ACPE's 2014 Evaluation Team Report ("ETR") from its site visit that year.  (ECF No. 55-1 at 938.)  The record then chronicles years of monitoring letters from ACPE, correspondence from ACPE, A&Rs, reports from HUSOP, and ETRs.  *See supra* note 4.

The Appellate documents include Hampton's notice of appeal, ACPE's appellate policies and procedures, the parties' narrative briefs to the Appellate Commission, and the parties' exhibits

---

[8] For example, many of the monitoring letters, A&Rs, and HUSOP Reports appear multiple times throughout the Administrative Record.  And some documents, such as faculty handbooks and student catalogues, submitted by HUSOP to the ACPE Board, take up hundreds of pages but do not significantly touch on the issues that purportedly animated the Board's ultimate accreditation action.

submitted to the Appellate Commission.  (ECF Nos. 56-1 – 56-4; ECF Nos. 57-1 – 57-2.)  On

appeal, Hampton submitted fifty-seven total documents, ranging from the reports it sent to ACPE,

articles about the important role of HBCU pharmacy schools in serving underserved communities,

and more internal data about its program.  (*See* ECF No. 56-1 at 295-96.)  ACPE submitted its

reports, its standards and policy guidance, and at least one internal memo, among other

submissions.  (*See* ECF Nos. 56-3 – 56-4; ECF Nos. 57-1 – 57-2.)  Also included in the appellate

section of the record is a transcript of the April 28 hearing, (ECF No. 56-2 at 426-502), and the

one-page Appellate Commission report, (ECF No. 56-2 at 552).

D. Allegations of Bias

Plaintiff, in its Complaint and in multiple of the instant motions, claims that Defendant was

motivated by "bias and revenge."  (Compl. at 1.)  The Complaint points to more than one explicit

incident, and the Plaintiff additionally argues that bias is evidenced by the fact that it was treated

more harshly than "comparator" institutions.

With regard to the purported explicit examples of bias, Plaintiff points specifically to a

2017 meeting between HUSOP representatives and ACPE staff.  At that meeting, then ACPE

Executive Director Peter Vlasses[9] allegedly "stated that ACPE gave HUSOP 'the rope' by granting

the school an eight-year accreditation term, and he proceeded to remind Dr. Iyer about ACPE and

Hampton's history dating back to a 2009 lawsuit Hampton filed against ACPE for a different

accreditation decision."  (Compl. ¶ 27.)  Plaintiff characterized this as confirmation "that the deck

had been stacked against HUSOP from the beginning, and the agency had no intention of seeing

HUSOP flourish to become a successful program," and also characterized these as "racially

motivated words . . . ."  (*Id.* ¶¶ 94, 106.)

---

[9] Plaintiff makes no indication that Dr. Vlasses was a member of the ACPE Board that ultimately made the accreditation decision.

The Complaint also references "caustic comments made to HUSOP by ACPE representatives and Board members about the prior lawsuit and 'long history' between the two," implying that the ACPE Board has referenced the prior lawsuit at least twice. (*Id.* ¶ 93.) Plaintiff's proposed amended complaint adds:

> On a number of occasions, ACPE representatives, including Dr. Mone, told faculty and staff that HUSOP did not forget the 2009 lawsuit in which HUSOP sued ACPE. In fact, former ACPE Executive Director Peter Vlasses felt the need to inform the ACPE Board of the "litigious nature" of Hampton after the 2009 lawsuit.

(ECF No. 75-1 ¶ 39.) Plaintiff has apparently not turned up any additional allegations of bias from expedited discovery and depositions of ACPE Board members, except for the purported "comparator data."

During expedited discovery, United States Magistrate Judge Lawrence R. Leonard granted Plaintiff's motion to compel ACPE to provide data regarding other pharmacy programs that triggered certain monitoring metrics, but ordered that this information be redacted to protect the identities of these institutions. (*See* ECF No. 41.) Plaintiff explains in its Memorandum in support of its Motion for Preliminary Injunction that:

> ACPE produced redacted documents showing that, according to its own calculations, 87 pharmacy programs (including HUSOP) triggered monitoring for crossing "progression data" benchmarks between the years 2014 and 2020. Though the nature of the redacted production makes it somewhat difficult to discern, of those schools, many performed worse than HUSOP on one or multiple years as measured by these data, yet none of their accreditations were withdrawn.

(Mem. Supp. Mot. Prelim. Injunct., ECF No. 48 at 51.) Plaintiff's preliminary injunction brief highlights five specific examples. (*Id.* at 52-53.) Plaintiff notes that of the schools that triggered progression monitoring but did not have their accreditation withdrawn, "none of these schools were HBCUs." (*Id.* at 53.)

11

Plaintiff filed a sealed exhibit to its Motion for Preliminary Injunction that compiles this data. (ECF No. 63.) This exhibit contains a series of monitoring letters from ACPE, similar to those sent to HUSOP, that were sent to programs for triggering progression thresholds. Because the information is redacted and limited to monitoring letters and not school or ACPE reports, it is difficult to draw any broad conclusions from these documents.

## II. JUDICIAL REVIEW OF CHALLENGES TO ADVERSE ACCREDITATION ACTIONS

This action involves a challenge to an adverse accreditation action and, thus, these preliminary motions are impacted by the overarching standard of review in these cases. Judicial review of challenges to accreditation actions by private accrediting agencies is limited. The Fourth Circuit squarely addressed this issue in 2015 in the case *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161 (4th Cir. 2015), adopting a lenient federal common law standard of review that looks to "whether the accreditation decision was supported by substantial evidence or otherwise arbitrary and capricious." 781 F.3d at 166; *see also Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 922 F.3d 568 (4th Cir. 2019); *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 742 (4th Cir. 2017) (unpublished opinion). Although these private entities are not technically state actors, given their outsized educational role that directly impacts federal programs, "there exists a common law duty . . . to employ fair procedures when making decisions affecting their members." *Pro. Massage*, 781 F.3d at 169 (internal quotations and citations omitted).[10]

---

[10] Notably, 20 U.S.C. § 1099b(f) confers exclusive jurisdiction on federal courts to consider challenges to adverse action by accrediting agencies. Some courts have held that this statutory grant of authority implies the existence of this federal common law duty. *Pro. Massage*, 781 F.3d at 170 (citations omitted).

In *Professional Massage*, the Fourth Circuit overturned the decision of the district court, which had reversed an accrediting agency's decision to deny reaccreditation to a massage therapy program. *Id.* at 166. In doing so, the Fourth Circuit set forth a lenient standard of review and some general principles. It explained, "[t]he proper standard of review of actions by private accrediting agencies considers only whether the accreditation decision was supported by substantial evidence or otherwise arbitrary and capricious." *Id.* The court rejected what it considered a "de novo approach to the accreditation process" employed by the district court. *Id.* at 169. It explained that federal judges in this context should defer to the the subject matter experts at the agency, and that the accrediting agency's "duty, put simply, is to play it straight." *Id.* at 170. The Fourth Circuit suggested that the court's analysis in these cases should mirror the analysis of federal administrative law claims: "due process claims dovetail nicely with administrative law concepts of substantial evidence and arbitrary and capricious review because the prominent point of emphasis of due process is one of procedure." *Id.* at 172.

The broad standard, then, is whether the agency's decision was supported by substantial evidence or whether it was arbitrary or capricious. "Due process requires that the basis for revocation of accreditation be provided in writing and supported by the evidence." *Id.* at 179. "The Supreme Court has defined substantial evidence to be anything 'more than a mere scintilla' provided that a 'reasonable mind might accept [the evidence] as adequate to support a conclusion.'" *Id.* at 174 (quoting *Almy v. Sebelius*, 679 F.3d 297, 301 (4th Cir. 2012) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). "In considering whether the denial was supported by substantial evidence, we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision." *Id.* at 174-75.

"When adjudicating common law due process claims against accreditation agencies, courts should 'focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision.'" *Id.* at 172 (quoting *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs.*, 957 F.2d 210, 214 (5th Cir.1992). The court should look for "discernable substantive standards," but these standards are allowed to be "general in nature" and "to retain some element of flexibility." *Id.* at 173-74.

Courts have identified a key exception that can skew this generally favorable standard more toward the plaintiff—the existence of bias or prejudice. *See Morris v. City of Danville*, 744 F.2d 1041, 1044 (4th Cir.1984) (quoting *Bowens v. N.C. Dept. of Hum. Res.*, 710 F.2d 1015, 1020 (4th Cir. 1983)). "A federal court may be justified in conducting a more searching inquiry into the motivations of administrative decisionmakers in the case of 'a strong showing of bad faith or improper behavior.'" *Pro. Massage*, 781 F.3d at 177-78 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). However, the agency decision maker is entitled to a "presumption of honesty and integrity." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Thus, while a plaintiff can unlock a deeper inquiry into the motivations of the administrative decisionmakers, the plaintiff must first make a "strong showing of bad faith or improper behavior." *Overton Park*, 401 U.S. at 420. Examples of a plaintiff attaining this standard are rare. *Professional Massage* suggests two situations in which this standard may be met: when an adjudicator has a financial interest in the outcome or was personally abused or criticized by the party before her. 781 F.3d at 178 (citations omitted).

Notably, courts have rejected disparate treatment inquires in accreditation cases. *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 528 (6th Cir.

2001) (explaining that courts "have refused to consider claims of disparate treatment of accreditation applicants") (citing *Marlboro Corp. v. Ass'n Indep. Colls. & Schs., Inc.*, 556 F.2d 78, 80 n. 2 (1st Cir. 1977); *Transport Careers, Inc. v. Nat'l Home Study Council*, 646 F. Supp. 1474, 1485-86 (N.D. Ind. 1986)).   Rather than weighing the relative qualifications of different schools, the Sixth Circuit suggested that the judicial inquiry should be focused on the core standard of review: whether the accrediting agency acted in an arbitrary or unreasonable manner, and whether its decision was based on substantial evidence.   *Id.* at 529.   "[D]elving into the comparators and their treatment by the alleged defendant entity really reduces the court's role to conducting *de novo* review of a defendant's evaluative decisions."   *Mountain State Univ., Inc. v. Higher Learning Comm'n*, No. CV 5:14-16682, 2017 WL 963043, at *14 (S.D. W.Va. Mar. 10, 2017) (internal quotations and citations omitted).   As these courts have explained, such a disparate treatment analysis would require the court to put itself into at least two pairs of accreditors' shoes: comparing the propriety of the decision with respect to the plaintiff against the propriety of the accreditation of the other school or schools.   This arguably would involve an impermissible *de novo* review of the accreditors.

Finally, courts are typically reluctant to consider legal claims challenging adverse accreditation actions that are based in a source of law outside of the federal common law due process right.   *See Found. for Interior Design Educ. Research*, 244 F.3d at 532 (citations omitted). This is especially pronounced with respect to challenges brought under state law, given that 20 U.S.C. § 1099b(f) gives the federal courts exclusive jurisdiction over these challenges.   *See Pro. Massage*, 781 F.3d at 180 n. 3.   While the Fourth Circuit in *Profession Massage* declined to reach the question of whether state law claims are preempted, the Seventh Circuit strongly suggested that they are.   *See Chicago Sch. of Automatic Transmissions v. Accreditation All. of Career Schs.*

15

*and Colls.*, 44 F.3d 447, 449 (7th Cir. 1994) ("[I]t is all but impossible to see how federal courts could apply state law to the actions of accrediting agencies when state courts have been silenced by the provision for exclusive jurisdiction.").

### III. MOTION TO AMEND

On February 5, 2021, Plaintiff filed a Motion for Leave to Amend Its Complaint ("Motion to Amend") (ECF No. 75). Plaintiff seeks to file an amended complaint that "clarifies its claims and sets forth new facts revealed during expedited discovery" that are "central to Hampton's claims of bias, prejudice, and a violation of due process." (*Id.* at 1.) A review of the Proposed Amended Complaint (ECF No. 75-1) indicates that it adds a number of paragraphs and makes alterations and typographical changes to the original complaint. In addition to minor typographical changes, the Proposed Amended Complaint adds allegations that: HUSOP was treated differently from similarly situated pharmacy schools, ACPE relied on conflicting evidence and rationales during the decision-making process, and ACPE failed to abide by its policies and procedures in reaching its withdrawal decision.

Plaintiff raised the arguments about disparate treatment and Defendants' purported failure to abide by its policies and procedures in briefing on the Preliminary Injunction and Motion for Summary Judgment. (Pl.'s Mem. Supp. Mot. Am., ECF No. 76 at 3-4.) Plaintiff suggests that a main motivating factor in seeking the amendment is to clarify that it has not abandoned its argument that ACPE was motivated by bias, responding to an argument made in Defendant's reply brief in support of summary judgment. (*Id.* at 6.) The Plaintiff suggests that the amendment "should not delay or interfere with the Court's ability to rule on the pending motions . . . ." (*Id.* at 2.) ACPE opposes the motion and asks the Court to deny it, or in the alternative, "deem the responsive substantive motions, including ACPE's Partial Motion to Dismiss and Motion for

Summary Judgment submitted and under advisement." (Resp. Br. Opp'n Mot. Am., ECF No. 78 at 20.) The parties appear to be in general agreement about the Rule 15 standard for amending a complaint: that the Court should freely give leave to amend absent bad faith, prejudice, or futility, but that the ultimate decision is within the Court's discretion.

A. Legal Standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure dictates that if an amendment to a pleading is filed or requested beyond the period in which amendments are allowed as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The Fourth Circuit interprets Rule 15(a) "to provide that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." *Laber v. Haney*, 438 F.3d 404, 426-27 (4th Cir. 2006) (internal quotations and citations omitted); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). The Court's decision on a motion to amend is reviewed for abuse of discretion. *Foman*, 371 U.S. at 182.

The determination of whether an amendment is prejudicial to a defendant is context-dependent and "will often be determined by the nature of the amendment and its timing." *Laber*, 438 F.3d at 427. "[D]elay alone is not sufficient reason to deny leave to amend." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). In *Connelly v. General Medical Corp.*, Judge Spencer rejected the argument that an amendment that would add additional facts, but no new claims, would be prejudicial to the defendant that had already filed a motion for summary judgment on the original complaint. 880 F. Supp. 1100, 1109-10 (E.D. Va. 1995). He explained, "[t]he court can easily stir these new allegations into the analytical brew of this case and still apply

17

the same controlling legal principles. Thus, the defendants will not be unduly prejudiced by the proposed amendment." *Id.* at 1110 (citing *Sandcrest Outpatient Servs. v. Cumberland Cty. Hosp.*, 853 F.2d 1139, 1148–49 (4th Cir.1988)).

An amendment is deemed "futile" if it cannot withstand a motion to dismiss. *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (citations omitted). Futility is only a sufficient ground to deny leave to amend "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510 (citations omitted). The Federal Rules of Civil Procedure only require that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* On a motion to dismiss, the Court "must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)).

B. Party Arguments

In support of its Motion, Plaintiff argues that leave should be granted because the case is still at its early stages with no current scheduling order or deadlines, the proposed amendment is sought in good faith and will not prejudice the Defendant, and the Proposed Amended Complaint will not be futile. Plaintiff contends that the additions to the complaint were uncovered during expedited discovery and that any delay in filing the motion is justified by the fact that this is an "incredibly complex case." (Reply Supp. Mot. Am., ECF No. 83 at 4.) It argues that amendments

18

should be denied on futility grounds only if the amended complaint fails to state a claim, and that the Proposed Amended Complaint does state a claim. Plaintiff points out that the amendments were a direct response to the Defendant's claim that it was giving up on its bias assertions. And Plaintiff cites cases from district courts across the Fourth Circuit for the proposition that amendments should be allowed to add facts that support existing legal theories and do not add legal arguments.

The Defendant's argument rests primarily on the allegations that (1) the Motion to Amend is being filed too late and seeks to delay litigation, and (2) the proposed amended complaint does not "materially impact" Hampton's case, respond to Defendant's dispositive motions, or add any new counts or legal theories. (Resp. Br. Opp'n Mot. Am. at 1-2.) Defendant engages in a review of the procedural history of the Motion to Amend, including the fact that expedited discovery closed in October and summary judgment briefing concluded in December, to support the proposition that this February motion comes too late in the game. Defendant alleges that Plaintiff seeks to delay "proper disposition of the case" and open the door to additional discovery, which Defendant says is unnecessary. (*Id.* at 2.) Thus, Defendant alleges Plaintiff lacks a good faith basis for the proposed amendment. Additionally, ACPE argues that the claimed basis for the amendment does not align with the substance of the amendments, and that "none of the proposed amendments materially impact Hampton's case. Hampton does not propose to add any new counts, theories, or substantive allegations." (*Id.* at 7.) Defendant notes that Plaintiff is not correcting any deficiencies raised by Defendant's Motion for Summary Judgment or Partial Motion to Dismiss, and that the proposed amendments are futile given the lack of substantive changes and the limited scope of review of accreditation decisions.

C. Discussion

Plaintiff's requested amendment satisfies the liberal amendment standard under Rule 15. The proposed additions to the complaint are factual and typographical.  Plaintiff looks to add assertions about an alleged lack of notice and shifting rationales from ACPE, add an assertion about ACPE representatives' past references to Hampton's 2009 lawsuit, add declarations about disparate treatment, make typographical corrections, and assert that the ACPE Appellate Commission was not properly trained.  (*See* ECF No. 75-1.)  These proposed amendments do not add any new legal claims.  Indeed, Plaintiff declared that the proposed amendments "should not delay or interfere with the Court's ability to rule on the pending motions." (Pl.'s Mem. Supp. Mot. Am., ECF No. 76 at 2.)  Plaintiff asserts that its main motivations are to add facts learned in expedited discovery and to make clear that it is not abandoning its bad faith claim.

The federal standard for filing an amended complaint is highly permissive: the Court should grant leave absent prejudice to the opposing party, futility, or bad faith.  *Laber*, 438 F.3d at 426-27.  The Motion to Amend in this case is somewhat belated.  It was filed months after the period of expedited discovery, the revelations from which Plaintiff claims form the basis of the instant amendments.  But "delay alone is not sufficient reason to deny leave to amend." *Johnson*, 785 F.2d at 509.  And Defendant has not convincingly demonstrated that it will be prejudiced by this proposed amendment.  In fact, Defendant's response brief echoes Plaintiff's assertion that the amendment should not impact the pending motions when it says that the Proposed Amended Complaint will not "materially impact" Hampton's case.  (Resp. Br. Opp'n Mot. Am. at 7.)

Therefore, the key factor, prejudice, is not at issue.  Plaintiff asserts no new legal theories, just new facts and typographical corrections.  Trial is not imminent, and as both parties state, the amendments will not undermine consideration of the numerous pending motions.  As Judge

Spencer explained, the Court can simply "stir these new allegations into the analytical brew of this case" in order to decide the pending motion for a preliminary injunction, motion to dismiss, and motion for summary judgment.  *See Connelly*, 880 F. Supp. at 1110.

Additionally, the Proposed Amended Complaint is not futile.  As in *Connelly*, there are no new legal claims added, only factual assertions.  *See id.*  And the Proposed Amended Complaint does not appear on its face to fall short of the federal pleading standard.  *See Johnson*, 785 F.2d at 510 (citations omitted).  And finally, there is no serious indication of bad faith.  Although the filing is somewhat late, Defendant has failed to demonstrate how adding a smattering of new facts to the complaint will meaningfully delay the resolution of this action.

Accordingly, the Court will grant the Motion to Amend and will deem that the pending motions shall apply to the amended complaint.

## IV. MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

On February 25, 2021, Hampton filed a Motion to Supplement the Administrative Record (Mot. Supplement, ECF No. 79), which seeks Court approval to add documents to the Administrative Record submitted by ACPE.  ACPE filed the Administrative Record on October 30, 2020, in conjunction with its Response to Plaintiff's Motion for Preliminary Injunction.  (ECF Nos. 52-57.)  The record submitted by ACPE contains over 6,000 pages, including over 4,600 pages of documents purportedly considered by the ACPE Board and over 1,400 pages of documents considered by the Appellate Commission.  (ECF No. 52-1.)  Hampton claims that the record submitted by ACPE is "clearly" and "woefully" incomplete. (Mot. Supplement at 1; Mem. Supp. Mot. Supplement, ECF No. 80 at 3.)  Plaintiff did not attach any specific documents that it requests to be included in the record, but rather identifies four broad categories of documents it requests to be added: (1) the "'package' of materials" provided to the board ahead of meetings

regarding HUSOP, (2) meeting agendas, notes, and minutes from meetings concerning HUSOP, (3) internal ACPE staff correspondence about HUSOP and correspondence between HUSOP and ACPE, and (4) information relating to other institutions accredited by ACPE.  (Mem. Supp. Mot. Supplement at 6-7.)  Plaintiff's motion is clearly connected to its contemporaneously filed Motion for Additional Discovery and for a Scheduling Order, discussed below, because Hampton is seeking an opportunity to use further discovery to identify specific documents that should be added to the Administrative Record.

A. Categories of Documents Requested to be Included

The categories of documents Hampton requests to be added to the record are each supported by separate justifications.  For the Board package of materials, Hampton claims that deposition testimony from expedited discovery revealed that ACPE would provide these packages to the Board ahead of Board meetings, and that these documents should be included in the record because they formed part of the Board's basis for its decision.  (*Id.* at 7-8, 12-13.)  Plaintiff requests that these documents be categorized based on the meetings for which they were provided to the Board.  ACPE responds that these documents—monitoring letters, action and recommendation (A&R) reports, and information on HUSOP's accreditation history—are already included in the record, and that ACPE is not obligated to break them out based on when exactly they were provided.  ACPE notes that Hampton has not specifically identified any documents that fall into this category that are not already in the record.

Regarding the meeting agendas, minutes, and notes, Plaintiff argues that deposition testimony revealed that these documents were considered by the ACPE staff when drafting the A&R reports for the Board, and that they must necessarily have been considered by the board as part of normal parliamentary order.  (*Id.* at 8-9, 13-16.)  ACPE argues that the Board did not rely on these documents in making its decision, but rather they merely reflect internal organization and

deliberation.  ACPE argues that the subjective motivations of individual agency decision makers are irrelevant to judicial review of agency action.

In its request for ACPE communications with and about HUSOP, Plaintiff points to various assertions by ACPE representatives during litigation that there is "a mountain of communication [between the parties] over the years." (*Id.* at 16-17.)  Plaintiff argues that the Board relied on the opinions and advice of the ACPE staff, and that the staff in turn relied on its own internal communications about HUSOP and HUSOP's communications with ACPE.  Thus, Plaintiff argues, these communications and all draft A&R reports should be added to the Administrative Record.  ACPE points out that Hampton already should possess all of its own communications with ACPE, and queries why Plaintiff would not specifically identify documents that were improperly excluded from the record if it is in possession of those documents.  ACPE further argues that internal ACPE staff communications are not relevant to the ACPE Board's ultimate conclusion, and that there is no indication that board members had access to these communications.

Finally, Plaintiff asks to include information regarding other institutions accredited by ACPE because the ACPE Board "explicitly and implicitly" compared HUSOP to other pharmacy programs when making its accreditation decision. (*Id.* at 23.)  Thus, it argues, data about these other programs should be added to the Record.  Plaintiff notes that deposition testimony during expedited discovery indicated that various board members considered HUSOP to be "bad" and lower performing compared to other pharmacy programs. (*Id.* at 18.)  For its part, ACPE considers this an "unprecedented" request. (Resp. Opp'n Mot. Supplement, ECF No. 84 at 20.)  It notes that no specific data has been identified or explained for inclusion in the Record, and that there is no credible contention that the Board considered specific information about other programs when making its decision about HUSOP.  ACPE asserts that it "does not compare schools as part of its

accreditation process," except to the extent that program monitoring thresholds are based on averages across institutions. (*Id.* at 20-22.) This monitoring data, however, is already reflected in the record it submitted.

## B. Legal Standard

Judicial review of an accrediting agency's decision is generally confined to the administrative record. As the Fourth Circuit explained in *Professional Massage*, "[i]n considering whether the [adverse action] was supported by substantial evidence, we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision." 781 F.3d at 174-75. The administrative record, in turn, is "the full administrative record that was before" the agency decision maker at the time of the decision. *Overton Park*, 401 U.S. at 420.[11] "The whole administrative record includes pertinent but unfavorable information, and an agency may not exclude information on the ground that it did not 'rely' on that information in its final decision." *Tafas v. Dudas*, 530 F. Supp. 2d 786, 793-94 (E.D. Va. 2008) (citations omitted). But not every document possessed or considered by the agency automatically makes the record, and often, deliberative documents are not included. Rather, the record is typically restricted to evidence, not "briefs[] and memoranda made by the [agency] or its staff . . . ." *Id.* at 794 (citations omitted) (quoting *Norris & Hirshberg v. SEC*, 163 F.2d 689, 693 (D.C. Cir. 1947)). "Only if internal agency documents themselves introduce 'factual information not otherwise in the record' must those portions of the documents be included in the administrative record." *Id.* (quoting *Nat'l Courier Ass'n v. Bd. of Governors*, 516 F.2d 1229, 1242 (D.C.Cir.1975)).

---

[11] Because of the overlap between due process challenges to accreditation decisions and administrative cases under the Administrative Procedures Act, courts considering accreditation challenges have generally adopted legal principles from these administrative law cases. *See Pro. Massage*, 781 F.3d at 172.

Courts have suggested that "if the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well." *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 U.S. Dist. LEXIS 45639, at *6-*7 (D. Md. Apr. 8, 2015) (internal citations and quotation marks omitted). The agency is the party tasked with submitting the administrative record.

Given this broad definition of the administrative record, we turn to the standard for attempts to supplement it. This standard favors the agency. The agency is entitled to a "strong presumption of regularity that it properly designated the administrative record," and supplementation of the record "is the exception, not the rule." *Id.* at *6 (quoting *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)). When considering whether this presumption has been overcome, courts often look for whether the proponent has "specific evidence" that the documents exist and belong in the record. *Tafas*, 530 F. Supp. 2d at 796; *see* 33 Wright, Miller, & Murphy, *Federal Practice and Procedure* § 8391 (2d ed. 2021) ("It takes more than speculation to persuade a court to supplement on the ground that an agency has relied on documents not in the record. The party seeking supplementation must provide concrete evidence amounting to reasonable, non-speculative grounds for its belief that the purportedly missing documents were considered by the agency." (citations and internal quotations omitted)).

Crucially, judicial review—and thus what belongs in the record—is focused on the agency's stated reasons for a decision, and the court typically should not go digging for deliberative documents. *See Camp v. Pitts*, 411 U.S. 138, 143 (1973); *Tafas*, 530 F. Supp. 2d at 794, 797. This concept is related to the existence of the deliberative process privilege, which allows for the protection of documents revealing the agency's deliberative process. *Tafas*, 530 F. Supp. 2d at 794. "Only if internal agency documents themselves introduce 'factual information not otherwise

25

in the record' must those portions of the documents be included in the administrative record." *Id.* (quoting *Nat'l Courier Ass'n*, 516 F.2d at 1242).  However, the government must formally invoke the deliberative process privilege.  *Id.* at 801.

C. Party Arguments

Hampton makes various arguments in support of its Motion to Supplement the Administrative Record.  Plaintiff argues that it can overcome the presumption that the record filed by ACPE is complete for the following reasons: (1) ACPE's short explanations frustrate judicial review, (2) the agency relied on materials not in the record, (3) Hampton has made a showing of ACPE's bad faith,[12] and (4) the case involves a complex decision, and the Court needs background and context to help make that decision.  (Mem. Supp. Mot. Supplement at 6, 20, 25.)  Hampton also argues that the Court must objectively evaluate the underlying process used by ACPE's Board and Appellate Commission, and that additional documents are needed for that evaluation.  (*Id.* at 22.)  Finally, Hampton argues that expedited discovery was not meant to be comprehensive of the entire case, and that further discovery is warranted to evaluate and support Plaintiff's various legal claims.

ACPE contends that the record it submitted is sufficient and already includes much of what Plaintiff is asking for, that Hampton has not met the standard to secure supplementation of the record, and that Hampton has not identified any specific evidence that should be included in the requested supplementation.  (Resp. Opp'n Mot. Supplement at 3.)  ACPE characterizes these requests as redundant, speculative, and improper attempts to conduct wide-ranging discovery into the administrative decision-making process.

---

[12] This bad faith showing is allegedly based on the "rope" comment, ACPE's repeated reference to Hampton's "litigious" nature, conflicting rationales for the withdrawal decision, and disparities in treatment between HUSOP and other pharmacy programs.

ACPE relies heavily on the legal standards for review of an accrediting agency's decision and for supplementing the administrative record under the Fourth Circuit's opinion in *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161 (4th Cir. 2015). The standard for judicial review limits the scope of review and thus restricts discovery and the evidentiary record the Court can consider. On the standard for supplementing the record, Defendant notes that the administrative record put forward by the agency is presumed to be complete, absent a clear showing that the record is incomplete. Here, it asserts that the record sufficiently contains all documents available to the Board and the Appellate Commission (respectively) at the times of their decisions. (Resp. Opp'n Mot. Supplement at 5.) According to ACPE, Plaintiff had ample opportunity—during expedited discovery and after ACPE sent it the proposed record—to raise specific objections to the record or to identify specific documents that should be included in the record, but has failed to do so.

## D. Discussion

Hampton University seeks to supplement the Administrative Record with additional documents it claims should be included in the record, but it does not attach or otherwise specifically identify which documents belong in the record, other than offering four broad categories of documents. Plaintiff asserts that this is because more discovery is needed to find particular documents to add to the record, and thus this motion is tied to its contemporaneous Discovery Motion. But in this motion, the legal presumption favors ACPE: the Court is to presume that the record produced by the agency is complete, absent a strong showing to the contrary. *See Otsuka*, 2015 U.S. Dist. LEXIS 45639, at *6. Here, ACPE has produced a 6,000-page Administrative Record that encompasses over a decade of communications, reports, and submissions from both parties. ACPE represents that this is the complete record. Considering this

27

presumption and the reasons that follow, the Court will deny the Plaintiff's instant request to supplement the Administrative Record.

Before delving into each specific category of evidence that Plaintiff seeks to include in the record, a review of the Court's previous findings and subsequent developments on this issue is in order.  In August 2020, the Court granted the Plaintiff's request for expedited discovery and "limited supplementation of the administrative record" with evidence of bias or bad faith, based on (1) the "rope" comment made by ACPE Executive Director Vlasses, and (2) multiple references to the 2009 lawsuit by ACPE officials.  (ECF No. 28 at 9.)  However, in light of the narrow standard of review, discovery was "limited to potential bias or prejudice underlying ACPE's withdrawal of accreditation."  (*Id.* at 10.)  The parties subsequently engaged in discovery, including document production and twenty depositions.  Other than the information about purported disparate treatment, which will be discussed below, it does not appear that the Plaintiff uncovered any substantial evidence about bias at ACPE during expedited discovery.[13]

Turning to the specific categories of information Plaintiff seeks to add to the record, Plaintiff first mentions the "Board's 'Package' of Materials"—the documents provided to ACPE Board members ahead of each of its meetings regarding Hampton.  (Mem. Supp. Mot. Supplement at 7.)  ACPE represents that everything included in the various packages provided to the board that belongs in the record is already included in the record it filed in October.  This assertion is presumed to be accurate, absent a strong showing that it is not.  *See Otsuka*, 2015 U.S. Dist. LEXIS 45639, at *6.

---

[13] The proposed amended complaint newly represents that Dr. Michael Mone, a member of the ACPE Board, was one of the ACPE officials who told HUSOP representatives that he had not forgotten Hampton's 2009 lawsuit against ACPE.  However, this presumably was already known to Hampton before expedited discovery (because HUSOP officials were recipients of these comments).  Thus, other than this one instance and the comparator data, no new bias allegations are added to the proposed amended complaint, nor was any new evidence of bias attached to the instant motions.

With respect to the "Board's Package of Materials," Plaintiff has not made a sufficiently strong showing that anything that belongs in the record has been excluded.  It does not point to specific documents that the board considered and should have been included but that were not.  Nor does it sufficiently explain how documents from this purported package of materials would be connected to its assertion of bias and prejudice, one of the limited justifications this Court previously gave for seeking supplementation.  Nearly six months passed between when the purported Administrative Record was first produced to Plaintiff and its filing of the instant motion, and Plaintiff was given an opportunity to engage in expedited discovery for purposes of supplementing the Administrative Record.  Yet Plaintiff is presently unable to identify specific documents from this "Board Package" that were improperly excluded from the record.  Here, it has not overcome the presumption of regularity.

Next, Plaintiff's request to add minutes, agendas, and notes from ACPE's Board meetings at which Hampton's accreditation was addressed meets a similar fate.  Again, Plaintiff is unable to overcome the presumption of regularity with specific examples of facts or documents that were considered by the ACPE Board in making its accreditation decision, but that are not included in the administrative record.  Moreover, it is unclear how such documents would provide admissible evidence of bias or prejudice, keeping in mind that this Court has already rejected an attempt to "seek wide-ranging discovery into the administrative decision-making process."  (ECF No. 28 at 3.)  To the extent that individual board members' notes provide some evidence of prejudice— which Plaintiff does not appear to allege—judicial review of agency action typically does not consider the "actual subjective motivation of agency decision makers," but is focused on the agency's stated justification.  *See Tafas*, 530 F. Supp. 2d at 794 (quoting *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir.1998)).

Additionally, Plaintiff's assertion that the minutes, notes and agendas must necessarily have been considered by the ACPE Board as part of "normal parliamentary order" misses the point of the Administrative Record—the record is not intended to encompass every piece of paper in the agency's binder, but rather the facts and data relied on by the agency in making its decision. Plaintiff would need to demonstrate, in the face of a contrary presumption, that the minutes, agendas, and notes introduce new factual information not otherwise in the record. *See id.* (quoting *Nat'l Courier Ass'n*, 516 F.2d at 1242.)  Plaintiff has not done so.  And the argument that these documents were used by ACPE staff to draft A&Rs, which were later adopted by the Board, is similarly unavailing.  Again, judicial review is focused on the facts and information considered by the Board, not deliberative documents and process-based papers that are one or two steps removed from the actual agency decision makers and formal decisions.

Next, Plaintiff requests that the Court allow Plaintiff to supplement the record with communications from ACPE "with and about Hampton."  (Mem. Supp. Mot. Supplement at 18.) In this request, Plaintiff comes the closest to meeting the rationale for additional discovery and supplementation previously authorized by the Court in August—demonstrating bias and prejudice. However, there are a number of shortcomings to this request, not the least of which is that Plaintiff has already had the opportunity to seek these documents through expedited discovery, yet does not produce or identify any specific documents that belong in the Administrative Record.  This paucity is most troubling with respect to communications from ACPE "with" Hampton: because Hampton was the recipient of these communications, it should be able to specifically identify which ones belong in the Administrative Record.  Its failure to do so is fatal to this portion of the request.

With regard to internal ACPE communications about HUSOP, Plaintiff is on somewhat stronger footing, because these documents could presumably illuminate bias and prejudice on the

part of ACPE.  Yet again, there are deficiencies with this request.  First, Hampton has already had a chance to obtain this evidence.  This category of communications was at the center of expedited discovery last fall, but Hampton has apparently failed to come up with anything new.  Now, it seeks to use essentially the same rationale for expedited discovery that it used six months ago—the rope comment in 2017 and various references by ACPE officials to the 2009 lawsuit—to try again.  But this inquiry cannot go on forever, especially in light of the presumption of regularity and the fact that internal deliberations of agency officials are typically not considered during judicial review of agency action.  Second, it is important to keep in mind that ACPE staff members, whose communications appear to be the primary target here, were not the ultimate decision makers with respect to the HUSOP withdrawal—the ACPE Board was.  To be sure, the Court can consider prejudice on the part of agency staff, considering the influence they may have on the Board.  Yet the Court should be careful to avoid too much onion peeling by including in the record documents that are multiple steps removed from the ultimate agency decision points.  And as ACPE points out, Hampton has not demonstrated that ACPE Board members had access to these internal communications, which generally would be necessary for them to be part of the record considered by the board.  Accordingly, the instant request to supplement the record with internal ACPE communications not specifically identified will be denied.

Finally, Plaintiff seeks to supplement the record with "comparator data"—accreditation data from pharmacy schools whose accreditations were not withdrawn—to demonstrate that HUSOP was disparately treated and therefore subjected to bias.  Plaintiff claims that this information was "explicitly and implicitly" considered by the ACPE Board, (*id.* at 23), while the Defendant claims that ACPE does not compare schools except to the extent that numerical thresholds (calculated by third party organizations) are based on averages across pharmacy

schools.  Ultimately, this request is too far afield from the standard of review to be applied by the Court and will be rejected.

Both the discovery requested by Plaintiff in its Discovery Motion[14] and the volume of the Administrative Record underlying the instant accreditation decision illustrate why Plaintiff is asking too much of the Court.  Plaintiff would have the Court consider a significant number of inputs from each school, reviewing data points, accreditation histories, and trends from each school to determine whether an accreditation decision was fair and appropriate as compared to another school.  Indeed, Plaintiff is presently contending that the over 6,000-page Administrative Record produced by ACPE is insufficient for judicial review of the instant accreditation decision.  Not only would Plaintiff's requested disparate treatment analysis be a complex and time-consuming task for the Court, the parties, and other pharmacy schools, but it would be a significant incursion into the domain of the accreditors.  Judicial review of accrediting decisions is limited to an arbitrary or capricious, substantial evidence standard that defers to the expertise of agencies.  And even to the extent that standard is modified upon allegations of bias, those allegations cannot countenance the Court stepping into the shoes of the accreditor to make two or more comparative, *de novo* evaluations of accreditation decisions.  *See Found. for Interior Design Educ. Research*, 244 F.3d at 528.  A comparative review of accreditation decisions involving multiple schools falls well outside of the Court's narrow berth in accreditation cases.  Therefore, the Court will reject the Plaintiff's request to supplement the record with "comparator data."

Plaintiff raises a few additional broad rationales for why supplementation of the record is appropriate, notably, that ACPE insufficiently explained its decision, thereby frustrating judicial

---

[14] This includes a request to seek discovery from and depositions of representatives of 10 different pharmacy schools, and then to depose ACPE representatives about the information gleaned from each school.  (Reply Supp. Disc. Mot., ECF No. 87 at 13.)

review, and that this case is so complex that the Court needs more information to make its decision. These rationales are rejected.  First, on the motion for expedited discovery, the Court already limited discovery and attendant supplementation to allegations of bias, not to a wide-ranging review of the administrative decision-making process.  (ECF No. 28.)  Second, for purposes of this motion, Plaintiff does not sufficiently demonstrate how ACPE's decision in the 2020 A&R frustrates judicial review.  Judicial review is limited in this context at an arbitrary and capricious, substantial evidence standard, and administrative agencies can rely on general standards.  *Pro. Massage*, 781 F.3d at 169.  Here, ACPE's A&R cited Standard 17 and the Administrative Record contains voluminous records and supporting information detailing the accreditation process, presumably giving the Court an adequate basis for judicial review.  Plaintiff has not overcome the presumption of regularity.  Third, by its failure to specifically identify documents, Plaintiff has not met its burden to clearly establish that there are particular documents that would fill in supposed blanks.  Fourth, Plaintiff has not sufficiently established that the case is so complex that more information is needed.  The Administrative Record presently contains more than ten years of documentation, and compared to other matters on the Court's docket, the subject matter for (limited) judicial review is not especially complex.

Plaintiff's Motion to Supplement the Administrative Record will be denied.

## V. DISCOVERY MOTION

On February 25, 2021, contemporaneous with its Motion to Supplement the Administrative Record, Plaintiff filed a Motion for Additional Discovery and for a Scheduling Order (ECF No. 81).  Plaintiff asserts that revelations from expedited discovery and ongoing concerns about bias and improper administrative decision making require further discovery.

Plaintiff, in its Reply brief, ultimately purports to limit its requested discovery to specific document and deposition requests.  (Reply Supp. Disc. Mot., ECF No. 87 at 13.)  First, Plaintiff seeks written discovery and depositions regarding comparator schools: pharmacy schools that Plaintiff alleges were similarly monitored by ACPE for progression issues, but which did not have their accreditations withdrawn.   During expedited discovery, United States Magistrate Judge Lawrence R. Leonard granted a motion to compel ACPE to produce redacted information about schools that were monitored for progression issues based on Plaintiff's suspicion that it was subjected to disparate treatment by ACPE.  (*See* ECF No. 41.)  Plaintiff now seeks written discovery about ten of these schools (including, presumably, their names and further data about ACPE's review of their accreditation), seeks to depose a representative from each of the ten schools, and then seeks to depose ACPE representatives regarding the revelations from these schools.  (Reply Supp. Disc. Mot. at 13.)

Second, Plaintiff seeks additional written discovery regarding internal ACPE communications about HUSOP, including a search of internal ACPE emails between 2016 to 2020 using new search terms.   Third, Plaintiff seeks written discovery and depositions of ACPE representatives regarding the training provided to the ACPE Appellate Commission.   Fourth, Plaintiff seeks further written discovery and ten depositions of ACPE representatives regarding the rationale for the Board's decision and whether they considered the relevant factors.  (Reply Supp. Disc. Mot. at 13.)

Finally, the Plaintiff requests that the Court issue a scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure in order to set dates and deadlines in this action.  (Mem. Supp. Disc. Mot., ECF No. 82 at 9-10.)

34

A. Legal Standard

In cases involving administrative review of agency action, discovery of materials outside of the administrative record is rare. *Tafas*, 530 F. Supp. 2d at 794 (citing *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 195 (3rd Cir. 2006)) ("Because judicial review of agency action is generally limited to the administrative record, discovery is typically not permitted."). "Plaintiffs seeking discovery . . . must overcome the 'presumption of regularity': the presumption that public officers have properly discharged their official duties . . . absent clear evidence that those duties were improperly discharged." *Id.* at 795 (quoting *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926)). This includes the "presumption that the agency properly designated the administrative record," and the plaintiff can only overcome this presumption and obtain extra-record discovery with "clear evidence to the contrary . . . ." *Id.* (citations omitted).

There are a few exceptions to this discovery restriction. One is when the record is incomplete. *Id.* at 794-95 (citations omitted). Another is when the plaintiff makes a "[s]trong showing of bad faith or improper behavior." *Id.* at 797 (quoting *Cmty. for Creative Non–Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990) (citing *Overton Park*, 401 U.S. at 420)). The Supreme Court has described this bad faith exception as "narrow." *Dept. of Comm. v. New York*, 139 S. Ct. 2551, 2574 (2019) (allowing for extra record discovery where "existing evidence [12,000 pages of internal documents] supported a prima facie showing that the [agency's state rationale] was pretextual"). "[M]ere allegations of bad faith are inadequate to overcome the presumption" of good faith, and there must be "a strong preliminary showing of impropriety" to justify extra-record discovery. *Tafas*, 530 F. Supp. 2d at 797 (citations and internal quotations omitted). This is a "high standard." *Id.* (citations omitted).

Finally, with respect to scheduling and discovery matters, "[a] district court has 'wide

latitude in controlling discovery and…its rulings will not be overturned absent a showing of clear abuse of discretion.'" *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003) (quoting *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986)).  Rule 16 of the Federal Rules of Civil Procedure provides for pretrial scheduling conferences.  It dictates that the court "must issue a scheduling order" after receiving a Rule 26(f) report or after a scheduling conference.  Fed. R. Civ. P. 16(b).  It "must" be issued "as soon as practicable," and within a specified time window (ninety days after a defendant is served or sixty days after a defendant appears) "unless the judge finds good cause for delay."  *Id.*  The only required contents of a scheduling order are that it "limit the time to join other parties, amend the pleadings, complete discovery, and file motions."  *Id.*

B. Party Arguments

Plaintiff raises two principle bases for additional discovery, purportedly based on information revealed during the expedited discovery process completed last fall.  The first basis is to continue to probe its allegations of bias and prejudice exhibited by ACPE.  (Mem. Supp. Disc. Mot. at 2-3.)  Plaintiff cites various district court cases for the proposition that extended discovery may be required in administrative cases in order to uncover invidious intent by the agency. Plaintiff again invokes the "rope" comment as well as various comments by ACPE representatives about Hampton University's 2009 lawsuit, which served as the basis for expedited discovery last fall.  Plaintiff additionally alleges that through expedited discovery, it uncovered evidence that it was disparately treated as compared to other "comparator" pharmacy programs that had triggered ACPE monitoring due to concerns about student progression, but whose accreditations were not withdrawn.  Back in September 2020, Judge Leonard granted Plaintiff's Motion to Compel limited discovery regarding these comparator programs, which was further limited by a protective order. (ECF Nos. 41, 45.)  Plaintiff now requests explicit information about these "comparator" programs

and seeks to depose program representatives to bolster its argument that ACPE was biased against HUSOP, based on the theory that ACPE treated HUSOP differently from other, presumably non-HBCU programs.

Plaintiff's second main basis for additional discovery is to bolster its claims that ACPE did not comport with due process in its decision, because ACPE Board members gave contradictory explanations for the withdrawal, did not properly consider the relevant factors, and because the Appellate Commission was not adequately trained.  (Mem. Supp. Disc. Mot. at 3-4.)  Plaintiff explains that this request goes hand-in-hand with its request to supplement the Administrative Record, such that the justifications for supplementing the Administrative Record also support further discovery into issues surrounding due process.  Plaintiff repeatedly points to purportedly contradictory statements made by various ACPE Board members during expedited discovery depositions.  For example, Plaintiff claims that some statements suggested that the standard surrounding student progression motivated the withdrawal, while others noted that student scores on the NAPLEX licensing exam was a central factor.  Plaintiff also asserts that it was misled throughout the review process and was not adequately informed about ACPE's concerns about student progression.  Finally, Plaintiff argues that Appellate Commission members were not adequately trained.  Further discovery is needed in the form of written discovery and depositions, Plaintiff claims, to help demonstrate how ACPE's process was flawed and its decision was contrived.

Finally, Plaintiff suggests somewhat in passing that it needs discovery to support its § 1981 and tort claims.  Plaintiff argues that it should not be limited to the administrative record in bringing these claims.  (*Id.* at 4-5.)

Defendant raises a number of arguments against additional discovery.  (Resp. Opp'n Disc. Mot, ECF No. 85.)   ACPE characterizes this motion as a late request for discovery, given that expedited discovery closed back in October 2020.  Plaintiff's motion was filed in late February, following briefing on Defendant's summary judgment motion.  ACPE says that Plaintiff is conflating the standards for expedited discovery in an administrative law case with the standard for supplementing the administrative record.  It notes that the Court previously authorized limited expedited discovery into bias and prejudice based on the allegation about the "rope" comment and the comments about the past lawsuit, and it argues that Plaintiff should not be able to recycle these same allegations to get a second crack at discovery when expedited discovery did not reveal anything to advance Plaintiff's bias claims.  ACPE also reiterates that discovery and judicial review is limited in challenges to accreditation decisions, and that Plaintiff has not sufficiently established that an exception should apply.

ACPE argues that Plaintiff's tort and § 1981 claims do not allow for additional discovery, citing the Fourth Circuit's recent opinion in *Professional Massage* for the proposition that miscellaneous tort claims cannot be used to evade the standard of review and discovery limitations in accreditation challenges.  (*Id.* at 17 (citing 781 F.3d at 172).)  ACPE notes that these non-due process claims are directly tied to the claim that the administrative process was improper and thus they do not require any unique discovery.  ACPE asks the Court to decide its dispositive motions on these claims—its Partial Motion to Dismiss and its Motion for Summary Judgment—before allowing discovery based on claims that should be dismissed.  Relatedly, ACPE suggests that the Court should decide the pending dispositive motions before issuing a scheduling order.

C. Discussion

In its Discovery Motion, Plaintiff requests that the Court authorize more discovery for two broad categories of information—information purportedly tied to allegations of bias, and information tied to ACPE's purported failure to provide due process.  For reasons that dovetail with the reasons for denying supplementation of the Administrative Record, these requests fail.  Moreover, at this stage of the litigation, the ancillary legal claims—state law tort claims and a § 1981 claim—do not provide a basis to make an end run around the traditional limitation on discovery in accreditation cases.  With respect to the request for a scheduling order, the Court will grant Plaintiff's request for a scheduling order, to be issued after an initial pre-trial conference with the parties.

The discovery requested by Plaintiff overlaps with the request to supplement the administrative record.  For example, Plaintiff is seeking further discovery of "comparator data" to pursue its disparate treatment claims.  Again, Plaintiff's requests run up against a series of walls.  One is the strong presumption against discovery in accreditation cases: Plaintiff must make a strong showing (in this case, of bad faith) to overcome this presumption.  Here, Plaintiff is relying for the second time on the "rope" comment and the ACPE officials' comments about the prior lawsuit.  It appears that the last round of discovery did not uncover any new evidence of bias other than the comparator data, addressed below.  Thus, Plaintiff has failed to make a sufficiently strong showing of bad faith to justify a second round of discovery on this issue.  The second wall is the standard of review in accreditation cases, which limits the Court to determining whether the Defendant had adequate rules in place and followed them, such that its decision was not arbitrary, capricious, or unsupported by substantial evidence.  This standard greatly limits the scope of

discovery the Court can authorize.  And third, the Court has already decided to limit the scope of discovery to claims of bias and prejudice, and not into the administrative decision-making process.

With respect to the requests for discovery of comparator data and communications with and about Hampton, those claims should be rejected for the reasons described in the Section IV above.  Crucially, Plaintiff has not made a "strong showing" of bias and prejudice to warrant additional discovery after it was already given one such allowance.  And the Court should cut off Plaintiff's request to dive into comparator data, as it misconstrues the Court's role in accreditation cases.

Similarly, the Court will deny the request for more discovery to investigate the administrative decision-making process and attendant rationales.   In the expedited discovery context, the Court has already rejected this broad line of inquiry under the presumption against it. (ECF No. 28 at 3.)  Moreover, Plaintiff has not sufficiently demonstrated that it learned anything new, in expedited discovery or otherwise, that warrants departing from the presumption against extra-record discovery and the Court's narrow standard of review in these cases.

Plaintiff half-heartedly makes the argument that its legal claims outside the common law due process claim warrant further discovery.  But the Plaintiff has not sufficiently demonstrated how these claims raise issues that are not directly tied to a review of the agency's accreditation decision.  Courts are loathe to countenance non-due process causes of action challenging adverse accreditation actions, which would clearly risk authorizing an end run around the well-established standards for discovery and judicial review in these cases.  This is particularly pronounced in the context of state law causes of action, given the strong argument that federal law preempts state law with respect to accreditation.  *See* 20 U.S.C. 1099b(f); *Chicago Sch. of Automatic Transmissions*, 44 F.3d at 449.  In the event that these non-due process claims are able to survive the pending

dispositive motions and the Plaintiff is able to establish that these cases warrant extra-record discovery, Plaintiff may move for the Court to authorize more discovery.

The Court will grant Plaintiff's request to issue a scheduling order, to be entered after an Initial Pretrial Conference with the parties pursuant to Rule 16 of the Federal Rules of Civil Procedure.

## VI. CONCLUSION

For the aforementioned reasons, the Court will grant Plaintiff's Motion to Amend, deny Plaintiff's Motion to Supplement the Administrative Record, and grant in part and deny in part Plaintiff's Discovery Motion.

Let the Clerk file this Memorandum Opinion electronically and notify all counsel accordingly. An appropriate Order shall issue.

/s/ _____
Roderick C. Young
United States District Judge

Norfolk, Virginia
Date: July 27, 2021

41