IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| HAMPTON UNIVERSITY, )<br>　　　Plaintiff, )<br>　　　　　v. )<br>　　　　　　　　　　　）<br>ACCREDITATION COUNCIL FOR )<br>PHARMACY EDUCATION, )<br>　　　Defendants. )<br>　　　　　　　　　　　） | Civil Action No. 4:20-cv-00118 (RCY) |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant's Motion for Summary Judgment (ECF No. 69) and Plaintiff's Motion for Summary Judgment (ECF No. 105). The Court held a hearing on Defendant's Motion for Summary Judgment on September 14, 2021. Following the hearing, the Court granted Plaintiff leave to file a motion for summary judgment. Plaintiff's Motion for Summary Judgement has been fully briefed, and the Court dispenses with oral argument as to Plaintiff's Motion for Summary Judgment because the facts and legal contentions are adequately presented in the materials before the Court and additional oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, Defendant's Motion for Summary Judgement will be granted in part and denied in part, and Plaintiff's Motion for Summary Judgment will be denied.

## I. BACKGROUND

Hampton University School of Pharmacy ("Hampton" or "Plaintiff") is a non-profit University and a member of Historically Black Colleges and Universities ("HBCU"). (Compl. ¶ 1, ECF No. 1.) The Accreditation Council for Pharmacy Education ("ACPE" or "Defendant") is the exclusive accreditor of Doctor of Pharmacy programs in the United States. (Def.'s Mem. Supp.

1

Mot. Summ. J. at 4,[1] ECF No. 70; ECF. 70-2 at 7.)  ACPE evaluates and accredits programs "in accord with Standards and Guidelines for the Professional Degree Program Leading to the Doctor of Pharmacy (PharmD) Degree ("the Standards"). (ECF No. 70-2 at 7.)  The Standards demonstrate the minimum accreditation requirements, and programs are expected to exceed the Standards. (Def.'s Mem. Supp. Mot. Summ. J. at 5; ECF No. 70-3 at 5.)  The Standards were first published in 1937 and are revised periodically to keep up with changes in pharmacy education and practice.[2] (ECF No. 70-2 at 8.)  The ACPE's ten-member Board of Directors ("the Board") "determines compliance with the standards, likelihood of continued compliance with such standards, and the eligibility of the program to be accredited." (Def.'s Mem. Supp. Mot. Summ. J. at 5; ECF No. 70-2 at 7.)  In doing so, the Board is governed by a document titled "Policies and Procedures for ACPE Accreditation of Professional Degree Programs" ("Policies and Procedures"). (Def.'s Mem. Supp. Mot. Summ. J. at 5; ECF No. 70-2.)

The Board annually monitors programs to ensure compliance with the Standards based on statistical analysis of program information and review of graduates' performance on standardized licensure examinations like the NAPLEX.[3] (Def.'s Mem. Supp. Mot. Summ. J. at 14; ECF No. 70-2 at 23.)  Programs trigger follow-up action by ACPE when statistical analysis of the program shows "a value greater or less (as applicable) than two standard deviations beyond the national mean for the criterion in question." (ECF No. 70-2 at 23.)  Along with NAPLEX performance, ACPE also monitors thresholds relating to on-time graduation under Policy 11.6.3 of the Policies and Procedures. (Def.'s Mem. Supp. Mot. Summ. J. at 14; ECF No. 70-2 at 25.)  On-time

---

[1] The Court employs the pagination assigned to all documents referenced herein by the CM/ECF docketing system.
[2] This matter involves two versions of the Standards: Standards 2007 and Standards 2016. (Def.'s Mem. Supp. Mot. Summ. J. at n.4, 6.)
[3] "NAPLEX" refers to the "North American Pharmacist Licensure Examination" which is necessary to obtain licensure as a pharmacist.

graduation monitoring under Policy 11.6.3 requires programs to report information regarding the most recent graduating class as it relates to matriculating class size, number of graduates completing the curriculum in the specified timeframe, number of academic dismissals, and number of student withdrawals. (ECF No. 70-2 at 25.)  ACPE notifies programs if the number of academic dismissals is greater than or equal to six percent of the matriculating class size; the number of students withdrawing from the program is greater than or equal to six percent of the matriculating class size; the number of students with a delayed graduation is greater than or equal to fifteen percent of the matriculating class size; or total attrition related to on-time graduation is greater than or equal to twenty-four percent of the matriculating class size.[4] (*Id.*; Def.'s Mem. Supp. Mot. Summ. J. at 14.)

ACPE's notification is accompanied by a request that the program identify the cause of and provide an action plan for correcting any of the aforementioned circumstances. (ECF No. 70-2 at 25; Def.'s Mem. Supp. Mot. Summ. J. at 14.)  When a program is found to be in partial compliance or non-compliance with the Standards, the program "is given a period not to exceed two (2) years to bring all standards into compliance." (ECF No. 70-2 at 22-23.)  The Board may grant a maximum one-year extension upon a showing of good cause by the program. (*Id.* at 23.) If a program fails to bring partially compliant or non-compliant standards into compliance within the given timeframe, the program will be placed on probationary status and may face an adverse accreditation action.[5] (*Id.*)  Policy 14 of the Policies and Procedures also affords programs a right to appeal adverse Board decisions to the Appellate Commission "on the grounds that the decision

---

[4] For this purpose, attrition is the total number of students who did not graduate on time for any reason, including delayed graduation, academic dismissal, or withdrawal from the program.
[5] Adverse accreditation actions include: "accredited with probation status, or denial or withdrawal of a program's accreditation by ACPE." (ECF No. 70-2 at 4.)

of the Board was arbitrary, prejudiced, biased, capricious, or based upon incorrect facts or incorrect interpretation of facts." (ECF No. 70-2 at 30-31.)

<u>ACPE Notifies Hampton of Issues Surrounding Progression</u>

In 2011, ACPE informed Hampton that it was "compliant with monitoring"[6] as to Standard 19: Progression,[7] a step below compliant under the Policies and Procedures. (Def.'s Mem. Supp. Mot. Summ. J. at 14-15; ECF No. 53-1 at 33.)  From 2011 to 2015, Hampton and ACPE routinely communicated regarding ACPE's monitoring of Hampton's ongoing issues with Progression and NAPLEX scores. (ECF No. 53-1 at 125-130.)  Later, in 2016, ACPE notified Hampton that it had triggered ACPE's annual monitoring thresholds. (ECF No. 55-1 at 1027.)  Specifically, Hampton fell below the standard mean related to performance on the NAPLEX and Progression. (*Id.* at 1027-1028.)  Accordingly, ACPE requested that Hampton appear before the Board during the Board's January 2017 meeting to discuss the issues and show cause as to why Hampton should not be put on probation. (*Id.* at 1028.)  Following the January 2017 Board meeting, Hampton—as requested by ACPE—submitted a detailed action plan outlining Hampton's plan to address the ongoing issues with Progression and NAPLEX scores. (*Id.* at 1036-1049.)  Nevertheless, during the Board's June 2017 meeting, the Board voted to place Hampton on probation for issues related to Standard 10: Curriculum Design, Delivery, and Oversight, and Standard 17: Progression. (*Id.* at 1051-52.)  Hampton was notified of the Board's decision to place Hampton on probation via a June 2017 Accreditation Action and Recommendation ("A&R") report. (*Id.*)  In July 2017, ACPE

---

[6] As set forth by the Policies and Procedures, compliant with monitoring means:
> [N]o factors exist that compromise current compliance; factors exist that, if not addressed, may compromise future compliance; OR factors exist that compromise current compliance; an appropriate plan exists to address the factors that compromise compliance; the plan has been fully implemented; sufficient evidence already exists that the plan is addressing the factors and will bring the program into full compliance.

(ECF No. 70-2 at 5.)
[7] Standard 19: Progression was later changed to Standard 17: Progression in ACPE's "Standards 2016." (Def.'s Mem. Supp. Summ. J. at n.6.)

once again notified Hampton that it triggered annual monitoring concerns specifically related to 2016 and 2017 NAPLEX scores and Standards No. 10 and 17. (*Id.* at 1070-71.)

Consequently, ACPE conducted an on-Site evaluation of Hampton in November of 2017. (*Id.* at 1120.)  As a result of the on-site evaluation, the Board found Hampton partially compliant with Standards No. 10 and 17. (*Id.* at 1123.)  ACPE issued another A&R report in January of 2018 wherein ACPE continued Hampton on probation for continued issues with Standards No. 10 and 17. (ECF No. 55-2 at 52.)  In its June 2018 A&R report, ACPE once again found Hampton non-compliant with Standards No. 10 and 17, and partially non-compliant with Standards No. 11 and 12. (*Id.* at 82-83.) Further, the June 2018 A&R provided the following:

> Standards No. 10 and 17 were originally found to be partially compliant in June 2016; however, as detailed in the January 17-20, 2018, Accreditation Action and Recommendations, the School was given an extension to January 2019 for bringing Standards No. 10 and 17 into compliance. This action was taken so as to have first-attempt NAPLEX pass rates for the graduating class of spring 2018 as an outcome parameter to determine the success of a variety of interventions designed to address these partially compliant standards.

(*Id.* at 84.)  Despite the extension, on July 6, 2018, ACPE notified Hampton that it triggered annual monitoring related to performance on the NAPLEX. (*Id.* at 91.)  In January 2019, Hampton was continued on probation for issues of compliance with Standard 17: Progression, which remained only partially compliant. (*Id.* at 138.)  The January 2019 A&R report noted the following regarding Standard 17: Progression:

> This standard has remained out of compliance well beyond the customary period allowed for a program to address issues of partial or non-compliance. ACPE has taken this action to continue the program's accreditation status in recognition of the School's many efforts to address ACPE's concerns. Most notably is the School's actions to address ACPE's concerns with Standard 10: Curriculum Design, Delivery and Oversight, found to be partially compliant in June 2016 but now found to be compliant with monitoring. ACPE shares the School's optimism that changes in admission criteria and in the curriculum will, within time, have a positive impact on Standard 17: Progression, and thus gives the School extra time to demonstrate

the anticipated positive outcomes that would bring Standard 17: Progression into compliance.

(*Id.* at 139.)   Nonetheless, in July of 2019, ACPE informed Hampton that it had once again triggered annual monitoring concerns related to NAPLEX and on-time graduation monitoring. (*Id.* at 156; Def.'s Mem. Supp. Mot. Summ. J. at 17.)   Specifically, Hampton's withdrawal rates were at 8.3%, greater than the 6% withdrawal rate permitted by Policy 11.6.3. (ECF No. 55-2 at 156-57; Def.'s Mem. Supp. Mot. Summ. J. at 17.)   As such, ACPE requested that Hampton appear before the ACPE Board to discuss the issues identified in the July 2019 A&R and to show cause as to why Hampton's accreditation should not be withdrawn for continued failure to successfully address the concerns regarding Progression and NAPLEX performance. (ECF No. 55-2 at 157; Def.'s Mem. Supp. Mot. Summ. J. at 17.)

Hampton presented at the January 2020 Board meeting where it reported on Progression data with respect to all currently admitted classes. (Def.'s Mem. Supp. Mot. Summ. J. at 17.) Hampton also reported the following data related to on-time graduation factors for future cohorts:

Hampton University School of Pharmacy

Progression of other cohorts

Verbally reported during the January 2020 Board of Directors Meeting

| Class of | Total number of students | Number of on-time graduates (%) | Number of Academic Dismissals (%) | Number of Withdrawals (%) | Number Delayed Graduation (%) | Attrition (%) |
|---|---|---|---|---|---|---|
| 2020 | 60 | 43 (71.7) | 8 (13.3) | 3 (5) | 6 (10) | 17 (28.3) |
| 2021 | 46 | 30 (65.2) | 4 (8.7) | 4 (8.7) | 8 (17.4) | 16 (34.8) |
| 2022 | 32 | | 4 | 0 (0) | 1 | 5 |
| 2023 | 12 | 12 (100) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |

(ECF No. 55-2 at 217; *see also* Def.'s Mem. Supp. Mot. Summ. J. at 17.)   Subsequently, the Board issued a January 2020 A&R report informing Hampton of the Board's decision to withdraw

accreditation for issues of compliance with Standard 17: Progression. (ECF No. 55-2 at 209.)  On February 6, 2020, Hampton exercised its right to appeal under Policy 14.1, on the "grounds that the board's decision was arbitrary, biased, capricious, and the result of incorrect interpretations of facts." (*Id.* at 218-219.)  Accordingly, the Appellate Commission held a hearing on April 28, 2020. (Def.'s Mem. Supp. Mot. Summ. J. at 7.)  On June 11, 2020, the Appellate Commission issued its decision affirming the Board's decision to withdraw Hampton's accreditation. (ECF No. 56-2 at 552.)

## II. PROCEDURAL HISTORY

Hampton filed its Complaint on July 23, 2020 (ECF No. 1).  Contemporaneously, Plaintiff filed a Motion for a Temporary Restraining Order to enjoin ACPE from formally withdrawing Hampton's accreditation at the upcoming July 29, 2020 ACPE board meeting (ECF No. 7). Hampton's Motion for a Temporary Restraining Order was denied on July 27, 2020 (ECF No. 14). On September 1, 2020, Defendant filed a Partial Motion to Dismiss. (ECF No. 31.)  Defendant sought to dismiss two of Plaintiff's nine counts (Counts IV and V) and the related portions of Plaintiff's declaratory judgment count (Count IX). (*Id.*)  Plaintiff opposed this motion and alternatively sought leave to amend its complaint.  (ECF No. 33.)

Plaintiff filed its Motion for Preliminary Injunction on October 16, 2020. (ECF No. 46.) As briefing ensued, ACPE filed the Administrative Record on October 30, 2020. (ECF Nos. 52-57.)  The Administrative Record exceeds 6,000 pages and comprises documents considered by the ACPE Board and the ACPE Appellate Commission in reaching their respective accreditation decisions.  On November 23, 2020, Defendant filed a Motion for Summary Judgment. (ECF No. 69) and a Memorandum in Support. (ECF No. 70.)  On December 21, 2020, Plaintiff filed a

Response in Opposition to ACPE's Motion for Summary Judgment. (ECF No. 73.)  Subsequently, Defendant filed a Reply in Support of Summary Judgment. (ECF No. 74.)

On February 5, 2021, Plaintiff filed a Motion for Leave to Amend Its Complaint ("Motion to Amend"). (ECF No. 75.)  Then, on February 25, 2021, Plaintiff filed two more motions: a Motion to Supplement the Administrative Record (ECF No. 79), and a Motion for Additional Discovery and for a Scheduling Order (ECF No. 81).  On July 27, 2021, the Court issued an opinion and order addressing the two motions.  (ECF Nos. 91-92.)  The orders (1) granted Plaintiff's Motion to Amend its complaint, (2) denied Plaintiff's Motion to Supplement the Administrative Record, (3) denied Plaintiff's request for additional discovery, and (4) granted Plaintiff's request to issue a scheduling order, pending an initial pretrial conference.

On August 3, Plaintiff filed an Amended Complaint. (ECF No. 93.)  On August 12, 2021, the Court granted Defendant's Motion to Dismiss Counts IV (Violation of Due Process Under the Higher Education Act) and V (Violation of 42 U.S.C. § 1981) and partially dismiss the pertinent parts of Count IX. (ECF Nos. 96-97.)  On September 2, 2021, the Court granted Plaintiff's Motion to Withdraw its Motion for Preliminary Injunction (ECF No. 99).  On September 14, 2021, the Court heard oral arguments on Defendant's Motion for Summary Judgement.  Following the hearing, the Court granted Plaintiff's request for leave to file a motion for summary judgment (ECF No. 103).  Plaintiff filed its Motion for Summary Judgment on November 1, 2021 (ECF No. 105). Defendant filed its Response in Opposition to Plaintiff's Motion for Summary Judgment on November 23, 2021 (ECF No. 112).  Plaintiff filed its Reply on December 6, 2021 (ECF No. 114). The Court now considers the parties' dueling motions for summary judgment.

# III. STANDARDS OF REVIEW

## A. Legal Standard on Summary Judgment

Summary judgement is appropriately granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." *DiSciullo v. Griggs & Co. Homes*, 2015 WL 6393813, at *4 (E.D.N.C. Oct. 22, 2015).  The burden then "shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "When confronted with cross-motions for summary judgment, 'the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, No. 2:16CV639, 2017 WL 5712120, at *2 (E.D. Va. Nov. 24, 2017) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "As to each motion, the Court must resolve factual disputes and competing rational inferences in favor of the non-movant." *Id.* However, because there do not seem to be any material differences between the parties' arguments in both sets of motions and the facts as stated are mainly based on the extensive administrative record filed by the parties, in the interest of efficiency, the Court will address the parties' arguments all at once.

## B. Legal Standard for Judicial Review of an Accreditation Decision

A point of contention between the parties has been the legal standard for judicial review of accreditation decisions.  The parties disagree regarding the amount of deference that should be given to the accrediting entity.  In *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career*

*Schs. & Colls.*, the Fourth Circuit explained that accreditation agencies are private entities and as such, they are not subject to the strictures of constitutional due process requirements. 781 F.3d 161, 169 (4th Cir. 2015).   However, accreditation agencies are "quasi-public" and "wield enormous power over institutions—life and death power, some might say," they owe a "common law duty. . . to employ fair procedures when making decisions affecting their members." *Wards Corner Beauty Acad.*, 290 F. Supp. 3d at 469 (citing *Pro. Massage Training Ctr.*, 781 F.3d at 169-70). "Their duty, put simply, is to play it straight." *Pro. Massage Training Ctr.*, 781 F.3d at 170.

In terms of deference, the Fourth Circuit has limited the scope of the Court's inquiry and the degree of deference owed to an accreditation decision.  Although this Circuit has recognized that accreditation agencies owe a common law duty, such a duty does not authorize courts to undertake a wide-ranging or *de novo* review of decision-making by accreditation agencies. *Pro. Massage Training Ctr.*, 781 F.3d at 170-71.  Instead, the scope of the fairness review is limited to considering whether the decision of an accrediting agency "is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Id.* at 171 (citing *Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 712 (6th Cir. 2006)).  In *Pro. Massage*, the Court explained that the "quasi-public nature of the accrediting institutions and their wide-ranging expertise in what may be highly technical and specialized fields of education" provides justification for a deferential standard. *Id.*  Similar to federal administrative agencies, an "accreditation agency's expertise and knowledge merits a measure of deference from generalist federal courts." *Id.*  Due to the disparities regarding knowledge of the specialized subjects taught at institutions of higher education, the Court does "not presume to be equipped to 'substitute [our own] judgment for the professional judgment of the educators involved in the accreditation process.'" *Id.* at 172 (citing *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colleges & Sch.*,

957 F.2d 210, 214 (5th Cir. 1992)).  In other words, "standards of accreditation are not guides for the layman but for professionals in the field of education." *Id.* (quoting *Parsons Coll. v. N. Cent. Ass'n of Colls. & Secondary Schs.*, 271 F.Supp. 65, 73 (N.D. Ill. 1967)).

Further, "due process claims dovetail nicely with administrative law concepts of substantial evidence and arbitrary and capricious review because the prominent point of emphasis of due process is one of procedure." *Id.*  Accordingly, while the "Administrative Procedure Act does not specifically apply to private accrediting agencies for education institutions, 'principles of administrative law are useful in determining the standard by which we review the agency's decision-making process.'" *Bristol Univ. v. Accrediting Council for Indep. Colls. & Sch.*, 691 F. App'x 737, 741 (4th Cir. 2017) (quoting *Pro. Massage Training Ctr.*, 781 F.3d at 170).  When evaluating common law due process claims, "courts should 'focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision.'"  *Pro. Massage Training Ctr.*, 781 F.3d at 172 (citation omitted). With this understanding of the Court's standard of review, we review ACPE's procedure and whether its decision comports with its duty of common law due process owed to Hampton.

## IV. ANALYSIS

### A. ACPE Provided Fair and Impartial Procedures and Followed its Rules in Reaching its Decision in Accordance with the Requirements of Common Law Due Process

As an accreditation agency, ACPE must afford Hampton a common law duty of due process.  Whether ACPE fulfilled this duty is the crux of the parties' dueling motions for summary judgement.  In order to evaluate whether ACPE has violated common law due process, we consider whether ACPE's "internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision.'"  *Pro. Massage*, 781 F.3d at 172 (quoting *Parsons Coll. v. N. Cent. Ass'n of Colls. & Secondary Schs.*, 271 F. Supp. 65, 73 (N.D. Ill. 1967)); *Bristol Univ*, 691

11

F. App'x at 741 ("Agency actions are generally invalid where the 'agency fails to follow its own procedures or regulations.'") (quoting *Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008). We consider whether ACPE's decision was "supported by substantial evidence" or was "otherwise arbitrary and capricious." *Pro. Massage*, 781 F.3d at 166. Hampton proffers a number of instances where ACPE allegedly failed to comply with its own rules or policies. We examine each of these proffers in turn.

### 1. Policy 11.5.1: Findings of Partial or Non-Compliance

Policy 11.5.1 of ACPE's Policies and Procedures requires that "[i]n the event that the Board determines a program is in partial or non-compliance with a standard or standards, the A&R will include notification of the finding of partial or non-compliance and outline the requirements for bringing the standard(s) into compliance." (ECF No. 70-2 at 22-23.) Hampton argues that Policy 11.5.1 requires that when ACPE finds a program to be partially or non-compliant with one of its Standards, ACPE must outline, in writing, what a program needs to do to bring the Standard back into compliance. (Pl.'s Mem. Supp. Mot. Summ. J. at 21, ECF No. 108.) Hampton argues that common law due process requires the same and that ACPE has repeatedly violated its own rule. (*Id.* at 22.) Hampton points to the June 2017 A&R Report wherein ACPE found Hampton to be non-compliant with Standard 17 yet allegedly failed to outline the requirements for bringing the standard into compliance. (*Id.*) Further, Hampton alleges that ACPE failed to identify any criteria or benchmarks that Hampton failed to satisfy. (*Id.*) Hampton also avers that ACPE failed to outline the requirements for bringing the standards into compliance in the June 2018 and January 2019 A&R reports. (*Id.*)

Conversely, ACPE argues that Policy 11.5.1 does not apply to the decision that is subject to the Court's review, that is, ACPE's decision to withdraw Hampton's accreditation. (Def.'s

Opp'n at 31, ECF No. 112.)  According to ACPE, Hampton never challenged or appealed the 2016 finding that Hampton was out of compliance or the 2017 probation decision. (*Id.*)  Thus, ACPE argues that since neither of these decisions is the subject of this Court's review nor was either decision the subject of a challenge from Hampton, these sections are irrelevant and immaterial to the Court's review. (*Id.*)  Nevertheless, ACPE argues that it complied with Policy 11.5.1. (*Id.*) When ACPE found that Hampton was out of compliance, ACPE informed Hampton of the findings and its expectations and requirements for Hampton to bring the standard into compliance. (*Id.*) ACPE requested that Hampton appear at the subsequent Board meeting and show cause as to why it should not be placed on probation based on Progression. (*Id.*)  Following Hampton's participation at the January 2017 Board meeting, ACPE informed Hampton in writing that Hampton was failing to approach the issues as "aggressively as warranted" and requested a "detailed action plan" from Hampton. (*Id.*)  After a review of Hampton's detailed action plan, Hampton's participation at the June 2017 Board meeting, and a review of Hampton's 2016 monitoring data, ACPE placed Hampton on probation in June 2017 based on non-compliance with Standard 17: Progression. (*Id.* at 31-32.)  Additionally, ACPE's June 2017 A&R informed Hampton that it remained non-compliant with Standard 17, ACPE's decision to put Hampton on probation, and the monitoring expectations and requirements to bring Hampton back into compliance. (*Id.*)

Read plainly, Policy 11.5.1 requires ACPE to provide an A&R report upon a finding of partial or non-compliance with the Standards.  Further, within the A&R report, ACPE must include two things.  First, ACPE must notify the offending program of its partial or non-compliance with the Standard(s). Second, ACPE must outline the requirements for bringing the standard(s) into compliance.  Here, the June 2017 A&R report does not satisfy the requirements of Policy 11.5.1.

The first page of the report clearly notifies Hampton of ACPE's decision to place Hampton on probation and the basis of the decision—issues of compliance with Standards No. 10 and 17. (ECF No. 55-1 at 1051.) However, the same cannot be said for the second requirement regarding how to bring standards back into compliance. Hampton aptly points to the A&R reports from June 2017, January 2018, June 2018, and January 19 as examples of the ACPE failing to include an outline of the requirements for bringing the standard(s) into compliance. Each of the aforementioned A&R reports include various important pieces of information including the requirement that Hampton submit a written interim report and what the report should include, the appeals process, and what outcomes could result from the submission of the interim reports. Some reports, like the January 2019 A&R report, include recognition of Hampton's efforts in addressing ACPE's concerns. (ECF No. 55-2 at 139.) The reports clearly state that "ACPE fully expects that the School will bring these standards into compliance," and they even include deadlines for when Hampton is expected to have brought the standards into compliance. (ECF No. 55-1 at 1054; ECF No. 55-2 at 54, 84, 139.) Yet, the named reports fail to include an outline of the requirements for bringing the standards into compliance. ACPE argues that it complied with the requirements of 11.5.1 as it "informed Hampton both of the finding of non-compliance, and its immediate expectations and requirements of Hampton—namely, that Hampton appear at the subsequent Board meeting and show cause as to why it should not be placed on probation with respect to Progression." (Def.'s Opp'n. at 31.) These immediate expectations and requirements do not include requirements for bringing the standards into compliance as required by 11.5.1. Instead, they amount to an opportunity for Hampton to plead its case against being put on probationary status. As such, ACPE's failure to include requirements for bringing standards back into compliance also shows its failure to comply with Policy 11.5.1. Nonetheless, as stated by ACPE,

Policy 11.5.1 does not apply to the accreditation withdrawal decision at issue.  Hence, this oversight is not fatal to ACPE and does not constitute the kind of prejudicial error "that would be needed to justify relief."  *Thomas M. Cooley L. Sch*., 459 F.3d at 716 ("[A] mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination.").

2. Policy 9.3.1: Notification of Probationary Status

Policy 9.3.1 of ACPE's Policies and Procedures requires ACPE to notify programs in writing "of a decision by the Board to place a program on probation." (ECF No. 70-2 at 17.)  "Such notification shall provide a statement of the reasons for the decision and a request for the program to make comment on the probation . . . ." (*Id.*)  Hampton argues that ACPE never provided a statement of reasons for putting Hampton on probation as required by Policy 9.3.1 and common law due process. (Pl.'s Mem. Supp. Mot. Summ. J. at 23.)  Hampton alleges that the June 2017, January 2018, June 2018, and January 2019 A&R reports are rife with boilerplate explanations and fail to discuss, analyze, or even mention the criteria and topics listed in the non-compliant standards. (*Id.* at 23-25.)  ACPE refutes Hampton's allegations, arguing that each A&R report provided notice to Hampton of its continued probationary status, the reasons for the continued probationary status, and the Standards in which the program remained out of compliance. (Def.'s Opp'n. at 34.)

Like Policy 11.5.1, Policy 9.3.1 contains two requirements when the Board decides to place a program on probation.  First, ACPE must provide a statement of reasons for the decision. (ECF No. 70-2 at 17.)  Second, ACPE must request that the program make a comment on the probation. (*Id.*)  Here, ACPE has fulfilled those requirements.  The June 2017, January 2018, June 2018, and January 2019 A&R reports referenced by Hampton each contain an "Accreditation Action" section

15

that lists the decision of the Board and which standards are partially compliant or non-compliant. (ECF No. 55-1 at 1051; ECF No. 55-2 at 52, 82, 138.)  The A&R reports also contain a section titled "Monitoring During the Accreditation Term," which requests either an on-site evaluation or an interim report.  This section consistently summarizes the specific Standards where Hampton has been found to be partially compliant or non-compliant. (ECF No. 55-1 at 1053-1054; ECF No. 55-2 at 53-54, 83-84, 139-40.)  Hampton understandably believes that the reasons stated within the A&R reports are insufficient.  However, the Court finds that ACPE provided not only a general statement of reasons for placing Hampton on probation but included the Standards in which the program remained out of compliance.  ACPE's identification of the partially compliant or non-compliant Standards is sufficient. *See Bristol Univ.*, 691 F. App'x at 742 ("ACICS's denial letter identifying Bristol's remaining violations of the Accreditation Criteria adequately explained its decision not to renew Bristol's accreditation, and no further explanation was necessary to satisfy the requirements of due process.").  As such, ACPE complied with the requirements of Policy 9.3.1. and similarly, common law due process.

   3. Policies 13.4 and 14.4.1: Notification of Adverse Action and Appeals Procedure

   Policy 13.4 requires that ACPE provide programs with written notification of an adverse accreditation action by the Board. (ECF No. 70-2 at 30.)  The notification "shall provide a statement of the reasons for the adverse accreditation action, along with notice of the right to appeal and the time constraints for initiating such an appeal." (*Id.*)  Policy 14.4.1 requires the Appellate Commission to provide a written report of its findings. (*Id.* at 33.)  Hampton contends that ACPE violated Policy 13.4 and due process by failing to include an explanation, reasoning, analysis, or discussion in the 2020 A&R report withdrawing Hampton's accreditation. (Pl.'s Mem. Supp. Mot. Summ. J. at 27-28.)  Hampton argues that the boilerplate language that ACPE used in the 2020

A&R does not provide a real explanation about what issues ACPE had with Hampton nor does it indicate the reasoning behind the Board's decision.  (*Id.*)  Hampton avers that ACPE's withdrawal decision is bereft of any discussion pertaining to relevant facts, data, or documents that lend support to its decision. (*Id.* at 29.)  Further, ACPE's withdrawal decision does not include which evidence it considered, what weight it gave that evidence, or any discussion of countervailing evidence. (*Id.*)  Hampton makes a similar argument regarding the Appellate Commission decision under Policy 14.4.1. (*Id.* at 30-32.)

ACPE disagrees with Hampton's characterization of ACPE's obligations under Policies 13.4 and 14.4.1.  ACPE argues that neither due process nor the Policies and Procedures require ACPE to provide a reasoned analysis or detailed explanation. (Def.'s Opp.'n at 37.)  ACPE argues that Policy 13.4 requires that ACPE provide a statement of reasons and that the January 2020 A&R report provides such a statement. (*Id.* at 38.)  Similarly, ACPE avers that Policy 14.4.1 simply requires the Appellate Commission to provide its conclusions in writing and that the Appellate Commission's report satisfies this requirement. (*Id.*)  ACPE argues that the cases Hampton cites are inapposite because those cases discuss the APA or requirements of *constitutional* due process. (*Id.* (emphasis in the original.))  ACPE also argues that Hampton's invitation to interpret the sufficiency of ACPE's written decision seeks an impermissible *de novo* review or a review that is deferential in name only. (*Id.* at 39.)

Although ACPE correctly asserts that the APA is not directly applicable here, the Fourth Circuit has held that "principles of administrative law are useful in determining the standard by which we review the agency's decision-making process." *Bristol Univ.*, 691 F. App'x at 741 (quoting *Pro. Massage Training Ctr.*, 781 F.3d at 170).  Nevertheless, "judicial review of accreditation decisions is more limited than review under the [APA]." *Thomas M. Cooley L. Sch.*,

459 F.3d at 713.  As such, we approach the evaluation of ACPE's procedure surrounding the withdrawal decision on the Board and Appellate Commission levels with these considerations in mind.

Policy 13.4 requires three components; a statement of the reasons for the adverse accreditation action, notice of the right to appeal, and the time constraints for initiating such an appeal. (ECF No. 70-2 at 30.)  The only requirement in contention is the statement of reasons. Hampton proffers several tests to determine the adequacy of ACPE's decisions and argues that ACPE fails each one[8]. (Pl.'s Mem. Supp. Mot. Summ. J. at 28-29.)  Hampton further asserts that the lack of discussion about relevant facts, data, or documents that could lend support to its decision, which evidence it considered, what weight it gave that evidence, and any discussion of countervailing evidence proves that ACPE failed to provide an adequate statement of reasons. (*Id.* at 29.)  While it is understandable that Hampton would have preferred that level of detail, we find that the Board provided a sufficient statement of reasons for the decision to withdraw Hampton's accreditation within its January 2020 A&R.

The January 2020 A&R clearly states that "it was the decision of the Board that the accreditation of the Doctor of Pharmacy program at Hampton University School of Pharmacy be withdrawn for issues of compliance with the following standard: Standard No. 17: Progression." (ECF No. 55-2 at 209.)  Furthermore, the report states that the Board made its decision to withdraw Hampton's accreditation based on the updates provided to ACPE "for spring 2017, spring 2018,

---

[8] Hampton cited the following tests: *Wash. Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*, 818 F. Supp. 2d 888, 894 (D. Md. 2011) (decision "contained no detailed analysis of those factors, nor did it provide a roadmap that might direct the Court to the specific evidence the Board had considered and weighed in reaching its conclusions") (citations omitted); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("We cannot determine if findings are unsupported by substantial evidence unless the [agency] explicitly indicates the weight given to all of the relevant evidence."); *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) ("The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result. The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.").

fall 2018, and fall 2019; discussion with School officials; and review of Annual Monitoring Data across several years of student cohorts (i.e., Progression and NAPLEX pass rates)." (*Id.*) Additionally, the January 2020 A&R expresses the concern that Hampton was first found to be non-compliant with Standard No. 17 in June of 2016 and that the changes made by Hampton had not resulted in improvement of Hampton's Progression and attrition percentages. (*Id.* at 210.) The report then goes on to note additional findings that Standard No. 24 is partially compliant and Standards No. 8, 10, 11, 12, 13, 16, 18, 22, 23, 25, and 19 are compliant with monitoring. (*Id.* at 210-11.) This explanation of accreditation withdrawal due to ongoing noncompliance with Standard No. 17 constitutes an adequate statement of reasons.

Hampton also references decisions in other cases that it characterizes as "reasoned" and "substantive." (Pl. Mem. Supp. Mot. Summ. J. at 30.) One of these substantive decisions is the initial decision at issue in *Bristol*, which is a five-page single spaced document that contains the same kind of information provided in the January 2020 A&R. The *Bristol* decision begins with a list of findings contributing to the denial of accreditation. (ECF No. 102-4.) While slightly more detailed and containing more reasons than the January 2020 A&R, the *Bristol* findings cite to the provisions of the Accreditation Criteria where the program fell short. (*Id.*) The same information can be gleaned from the January 2020 A&R as it cites to the specific Standards to which Hampton was non-compliant and partially compliant. However, the *Bristol* decision does not discuss what weight it gave any evidence cited nor does it contain any discussion of countervailing evidence. Even with these alleged deficiencies, the Court in *Bristol* still found that the "denial letter identifying Bristol's remaining violations of the Accreditation Criteria adequately explained its decision not to renew Bristol's accreditation, and no further explanation was necessary to satisfy the requirements of due process." *Bristol*, 691 F. App'x at 742. Similarly, we find that ACPE's

19

January 2020 A&R, identifying the standards with which Hampton was found to be partially compliant and non-compliant, adequately explains its decision to withdraw Hampton's accreditation, and no further explanation was necessary to satisfy the requirements of due process and Policy 13.4.

We reach the same conclusion regarding Policy 14.4.1 which requires the Appellate Commission to provide a written report of its findings. (ECF No. 70-2 at 33.)  Hampton asserts that the Appellate Commission "provided no 'written report' in any real sense," and that the Appellate Commission's decision is shockingly deficient under the law. (Pl.'s Mem. Supp. Mot. Summ. J. at 30.)  ACPE, however, argues that the Appellate Commission was only required to provide its conclusion in writing and that the Appellate Commission's report satisfies this requirement. (Def.'s Opp'n at 38.)  The Appellate Commission's report is a one-page document listing the actions taken by the Appellate Commission, what evidence was considered, the Commission's options in rendering a decision, and the Commission's finding as to the actions of the Board. (ECF No. 56-2 at 552.)

Hampton insists that we hold ACPE's "feet to the fire" regarding its decisions. ((Pl.'s Mem. Supp. Mot. Summ. J. at 31-32 (citing *W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 229 (4th Cir. 2019).)  Yet, Hampton bases its insistence on *W. Va. Coal Workers' Pneumoconiosis Fund*, a case concerning the APA that also emphasizes "that the APA 'is not intended to be a mandate for administrative verbosity.'" *W. Va. Coal Workers' Pneumoconiosis Fund*, 781 F. App'x at 229 (citing *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016)).  "So long as we can 'fairly discern' the path the agency took to its decision, we may not require the agency to say more." *Id.*  Here, the path taken by the Appellate Commission to reach its decision to uphold the Board's actions is discernable.  The Appellate Commission's report

20

informs that the Commission held a hearing during which evidence was presented by Hampton and ACPE. (ECF No. 56-2 at 552.)  The "[e]vidence was limited to a review of documents and testimony relevant to the standard upon which adverse action was based," and the "[e]vidence and testimony were limited to conditions present at the time the accreditation action was taken." (*Id.*) Further, "[i]mprovements in conditions or corrections of deficiencies were not considered." (*Id.*) After the hearing, the Appellate Commission convened and reviewed the information presented at the hearing and the supplemental briefs submitted by Hampton and the Board. (*Id.*)  Consequently, the Appellate Commission found that the actions of the Board were "consistent with its Standards for Accreditation and ACPE's policies and procedures." (*Id.*)   Through the Appellate Commission's report, we can discern what materials were considered in the Commission's report and more generally, how the Commission reached its decision to affirm the Board's action.  We find that though pauciloquent, the Appellate Commission's report satisfies the requirement of Policy 14.4.1.

### 4. Policy 14 and 14.2.1

Hampton asserts that ACPE failed to train its Appellate Commission in violation of Policy 14.2.1. (Pl.'s Mem. Supp. Mot. Summ. J. at 33; Pl.'s Opp.'n at 22.)  Policy 14.2.1 requires that "[p]rior to sitting as a member of the Appellate Commission, each member shall have been trained on ACPE's policies and procedures, including those related to distance education, in accordance with the training provisions of Section 11, paragraph 11.3."[9] (ECF No. 70-2 at 31.)  Hampton

---

[9] Section 11 paragraph 11.3 provides the requirements for on-site evaluations. It reads as follows:

> Prior to their participation in an on-site evaluation, all evaluation team members, including Board and staff members, must complete training on the standards, policies and procedures, evaluation techniques, and their role in the on-site evaluation. This training will include the application of the Standards and Guidelines and Policies and Procedures in the assessment of distance education programs.

(ECF No. 70-2 at 20.)

alleges that the Appellate Commission received no training or guidelines on how to conduct its review of the Board's decision-making process. (Pl.'s Mem. Supp. Mot. Summ. J. at 33.) Hampton cites excerpts from Appellate Commission depositions alleging that they confirm that the Appellate Commission did not receive the requisite training. (*Id.* at 34.)

ACPE rebuts Hampton's allegation with a declaration by Mary Kiersma, ACPE's Associate Director of Professional Degree Program Accreditation. (Def.'s Opp'n at 41; ECF No. 70-4 at 2.) The declaration states, under penalty of perjury, that Kiersma provided "a special training session [via Zoom] for the Appellate Commission members on April 27, 2020, prior to the Appellate Commission's hearing on April 28, 2020." (ECF No. 70-4 at 2.) The declaration also explains the substance of the training including "a discussion of ACPE's Standards 2016, ACPE's Policies and Procedures, an assessment of ACPE's Standards 2016, the types of accreditation status, an overview of the evaluation procedures, and the Appellate Commission's duties and responsibilities." (*Id.* at 2-3.)

We find that Hampton's characterizations of the Appellate Commission deposition excerpts are imprecise. Hampton first cites to the deposition of Appellate Commission member Todd Sorenson which reads as follows:

> Q: So you said that you received documents regarding the structure of the commission when you were first I guess appointed to be on the commission. Um, did you receive any training materials from ACPE?
>
> A: Training materials? I do not recall receiving anything that I would have considered training materials.

(Todd Sorensen Dep. Tr. at 3, ECF No. 108-2.) Second, Hampton cites to the deposition of Appellate Commission Member Terry Short:

> Q: So were there any guidelines on what you should consider with respect to compliance with Standard 17 or was this sort of an ad hoc discussion amongst the Appellate Commission members?

22

A: Can you give me -- can you rephrase the question? I'm not quite understanding what you're asking.

Q: Sure. Sure. Was the Appellate Commission given any guidance, written guidance or otherwise, about how to apply the standards and how to evaluate whether Hampton was compliant with those? I'll just leave that there. Were you given any guidance about how to apply them?

A: No.
------
Q: I wanted to go back to something you had said earlier. Your primary experience, it sounds like, was with the prior version of the standards before they were amended in 2016?

A: Yes, that's correct.

(Terry Short Dep. Tr. at 8-9, 12, ECF No. 108-3.) Lastly, Hampton cites to the deposition of

Appellate Commission Member Carmen Catizone:

Q: And as the commission, particularly as the chair, did you interact with ACPE staff at all?

A: Only for the logistics of the hearing and then to request or obtain materials from ACPE.
-----
Q: ·And then after that first meeting where you're approached about serving as the chair and you set the schedule, do you guys meet again prior to the actual hearing?

A: I did not meet, but I think there was a meeting for some of the commission members who were not familiar with Zoom, to teach them how to use Zoom. I did not participate in the meeting, and the commission as a whole did not meet until the hearing.
----
Q: So I know you mentioned earlier that you followed Robert's Rules of Order when running the meeting; is that correct?

A: Yes.

Q: Were you given any type of written guidelines or guidance on how to do that?

A: No.

(Carmen Catizone Dep. Tr. at 3-6, ECF No. 108-4.)  These excerpts do not confirm that the

Appellate Commission did not receive adequate training as alleged by Hampton.  The questions

asked by Hampton were indirect and often follow-up questions regarding other issues.  Not once

were the deponents directly asked if they received training prior to the Appellate Commission hearing.  Conversely, the Kiersma declaration directly addresses that ACPE held Appellate Commission training on April 27, 2020.  As such, Hampton has failed to present evidence that constitutes a genuine issue of fact as to whether the Appellate Commission was trained.  Accordingly, we find that ACPE complied with the training requirements under Policy 14.2.1.

Hampton also alleges that Policy 14, governing the Appellate Commission's procedures, violates due process as written. (Pl.'s Mem. Supp. Mot. Summ. J. at 34-37.)  Specifically, Hampton takes issue with the lack of rules provided concerning receiving or considering evidence, conducting deliberations, reaching a decision, the standard of proof, and guidelines as to how the Appellate Commission should arrive at its decision. (Pl.'s Mem. Supp. Mot. Summ. J. at 35.)  Hampton cites various cases containing more robust procedures for appeal, but not a single case required any of the policies Hampton contends are "missing" in Policy 14.  Again, while it is understandable that Hampton would prefer more detailed procedures, Hampton's preferences do not permit the Court to essentially rewrite ACPE's policies and procedures.  Here, the Appellate Commission unanimously decided that a simple majority vote was sufficient in rendering their decision, as permitted under Policy 14. (Pl.'s Mem. Supp. Mot. Summ. J. at 36.)  The assertion that the Commission could have adopted an even stricter unanimous standard is not for the Court to determine. *Pro. Massage Training Ctr.*, 781 F.3d at 172 ("We thus do not presume to be equipped to 'substitute [our own] judgment for the professional judgment of the educators involved in the accreditation process.'"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) ("[A]n agency [need not] consider all policy alternatives in reaching [a] decision.").  Given the appropriate deference, Hampton fails to demonstrate that the Appellate Commission's procedures under Policy 14 violate due process as written.

24

**B. ACPE's Decision was not Arbitrary and Capricious and was Supported by Substantial Evidence**

Moreover, ACPE's decision to withdraw Hampton's accreditation was supported by substantial evidence. Substantial evidence is "anything 'more than a mere scintilla' provided that a 'reasonable mind might accept [the evidence] as adequate to support a conclusion.'" *Pro. Massage Training Ctr.*, 781 F.3d at 174 (citing *Almy v. Sebelius*, 679 F.3d 297, 301 (4th Cir. 2012) (internal quotations omitted).  In evaluating ACPE's decision, the Court's role is circumscribed and limited to "examining the administrative record, to which the court will look in order to determine whether Defendant's decision was based on substantial evidence." *Mountain State Univ., Inc. v. Higher Learning Comm'n*, 2017 WL 963043, at *9 (S.D.W. Va. Mar. 10, 2017).  The Fourth Circuit has also established that "in considering whether the denial was supported by substantial evidence, we [federal judges must] confine ourselves to the record that was considered by the accrediting agency at the time of the final decision." *Id.* at 13 (*citing Pro. Massage Training Ctr.*, 781 F.3d at 174–75).

Hampton claims that one of the principal issues here is that the Board and Appellate Commission fail to identify specifically what evidence was considered, the weight evidence was given, and how any conflicts were resolved. (Pl.'s Mem. Supp. Mot. Summ. J. at 44.)  Hampton argues that even if ACPE complied with its own Policies and Procedures, they would still fail the substantial evidence test because neither the on-site evaluation nor the Progression data offers substantial evidence for ACPE's decision and the record contains no evidence that Hampton's Progression policies are flawed or fail to meet Standard 17 in any way. (Pl.'s Mem. Supp. Mot. Summ. J. at 43-51.)  Conversely, ACPE argues that its decision to withdraw Hampton's accreditation was supported by substantial evidence based on the years of correspondence with

Hampton regarding its issues of non-compliance with Standard 17. (Def.'s Mem. Supp. Mot. Summ. J. at 22-23; Def's Resp. at 43- 44, ECF No. 112.)

"ACPE standards are minimum requirements, and it is expected that programs will exceed these required standards." (ECF No. 70-3 at 5.)  The Board is charged with ensuring that programs meet these standards.   The 2020 A&R report states the reason for Hampton's accreditation withdrawal, Standard No. 17: Progression. (ECF No. 55-2 at 209.) Standard No. 17: Progression covers "[p]olicies and procedures regarding student Progression, early intervention, academic probation, remediation, missed course work or credit, leaves of absence, dismissal, readmission, due process, and appeals." (ECF No. 70-3 at 39.)  Programs are expected to stay within two standard deviations of the national mean for quantifiable factors relating to Standard 17: Progression. (ECF No. 70-2 at 23.)  Furthermore, ACPE considers other factors not explicitly included under Standard 17, such as NAPLEX scores and on-time graduation, in order to evaluate Progression. (ECF No. 56-2 at 477-78.)   ACPE is allowed such flexibility in ascertaining compliance with the Standards.  *Pro. Massage Training Ctr., Inc.*, 781 F.3d at 174 (explaining that accrediting agencies "must maintain a balance between specificity, to provide notice to those seeking accreditation, and generality, to allow itself flexibility in accrediting varied institutions ranging over many different fields and disciplines.").

The 2020 A&R report was not the first time that issues with the Progression standard had been brought to Hampton's attention.   In fact, ACPE and Hampton have been in constant communication throughout the years regarding Hampton's struggle with Standard 17—previously Standard 19—related to Progression compliance.  In 2016, Hampton triggered ACPE's annual monitoring thresholds by falling below the standard mean related to performance on the NAPLEX and delayed graduation under Progression. (ECF No. 55-1 at 1029-30.)  Accordingly, Hampton

was found non-compliant with Standard 19: Progression. (*Id.* at 1030.)  Subsequently, Hampton

was placed on probation in accordance with ACPE's June 2017 A&R report issues related to

Standard 10: Curriculum Design, Delivery, and Oversight, and Standard 17: Progression. (*Id.*) In

July 2017, Hampton triggered annual monitoring concerns related to 2016 and 2017 NAPLEX

scores and Standards 10 and 17. (*Id.* at 1070-71.)  ACPE continued Hampton on probation in

January 2018 and June 2018 for non-compliance with Standards 10 and 17. (ECF No. 55-2 at 52,

82-83.)  Notably, in January 2018, Hampton was given an extension, until January 30, 2019, to

bring Standards 10 and 17 into compliance. (*Id.* at 54-55.)  In January 2019, ACPE continued

Hampton on probation for partial compliance with Standard 17. (*Id.* at 138.)  Hampton once again

triggered annual monitoring concerns related to NAPLEX and on-time graduation monitoring in

July 2019 because Hampton's 8.3% withdrawal rate was greater than the 6% rate permitted under

Policy 11.6.3. (*Id.* at 156-57.)  Accordingly, as Hampton had surpassed the extension granted by

ACPE, Hampton appeared before the ACPE Board to show cause as to why its accreditation should

not be withdrawn. (*Id.* at 209; Def.'s Mem. Supp. Mot. Summ. J. at 17.)  As we know, the Board

decided to withdraw Hampton's accreditation for issues of compliance with Standard No. 17:

Progression. (ECF No. 55-2 at 209.)

In sum, Hampton's well documented issues with Standard 17: Progression provide more

than enough substantial evidence to support ACPE's decision to withdraw Hampton's

accreditation. Indeed, ACPE provided Hampton both procedural safeguards via the Policies and

Procedures and substantive discernable standards embodied in the Standards.  While ACPE did

not admonish Hampton's Progression policies as flawed or failing to meet Standard 17 as averred

by Hampton, ACPE made it abundantly clear that Hampton's data, and not its policies related to

Progression, led to the withdrawal.  Hampton's claims that there was no support in the Progression

data or on-site evaluation supporting ACPE's decision and that ACPE failed to identify what evidence was considered is also inaccurate.  As discussed above, the Progression data was brought to Hampton's attention every time Hampton triggered monitoring by falling below the standard mean related to NAPLEX scores or on-time graduation.   In fact, Hampton acknowledged its compliance issues with Standard 17 as they related to NAPLEX scores and on-time graduation. For example, after Hampton was notified that it had triggered monitoring based on 2016 NAPLEX scores and passage in July 2017, Hampton responded, confirming that it acknowledged "its partial compliance regarding Standards 10 and 17" and that "[t]he standards identified address Progression rates of students and their performance on the [NAPLEX]." (ECF No. 55-1 at 1035.) Accordingly, Hampton was aware—as far back as 2017—that Standard 17: Progression was measured by more than just Hampton's policies and that empirical data like NAPLEX scores were factored into the determination of compliance under Standard 17.   Hampton was also given additional time to bring Standard 17 into compliance but failed to do so. ACPE's review of Hampton's future Progression data also compounded ACPE's concerns that another extension would not be enough to bring Hampton into compliance.

Even if the Court disagreed with ACPE's grim view of Hampton's future, the fact remains that Hampton was not in compliance with the Standards, and ACPE was entitled to withdraw Hampton's accreditation on that basis. *Pro. Massage Training Ctr.*, 781 F.3d at 171 (the Court is unable to substitute its judgment "for the professional judgment of the educators involved in the accreditation process.").  We hold that the record provides substantial evidence to support the Board's decision to withdraw Hampton's accreditation.  Furthermore, given the procedures afforded to Hampton, the opportunities and extensions that it had to bring Standard 17 into compliance, and the copious notice it was given regarding its partial compliance and non-

compliance, it is clear that the accreditation withdrawal was not arbitrary and capricious. Rather, the Board "'conformed its actions to fundamental principles of fairness' through both the procedural and substantive standards it employed in making the accreditation decision." *Id.* at 173 (citation omitted).

The Court declines to rule on Hampton's bias claim as the parties have agreed that bias remains a factual issue inappropriate for summary judgment. (Sep. 14, 2021 Hr'g. Tr. at 74, 77, ECF No. 104.) Thus, ACPE's Motion for Summary Judgment as to the bias issue is denied.

## V. CONCLUSION

For the forgoing reasons, Defendant's Motion for Summary Judgment is granted in part as to Counts I, II, and the related portions of Count IX and denied as to Count III and Plaintiff's Motion for Summary Judgment is denied.

An appropriate order shall issue.

_____
/s/
Roderick C. Young
United States District Judge

Norfolk, Virginia
Date: <u>March 3, 2022</u>